STATE OF WEST VIRGINIA *ex rel.* ELSIE S. MORRIS

*v.*

THE WEST VIRGINIA RACING COMMISSION,

*A Corporation, Etc.*

(No. 10181)

Submitted July 25, 1949. Decided July 28, 1949.

HAYMOND, PRESIDENT, and RILEY, JUDGE, dissenting.

*James M. Mason, III,* for petitioner.

*Ira J. Partlow,* Attorney General, *Thomas J. Gillooley,* Assistant Attorney General, for defendants.

FOX, JUDGE:

This proceeding in mandamus, in which the original jurisdiction of this Court is invoked, involves the validity of certain rules and regulations in respect to horse racing in this State, as the same may be conducted under the provisions of Chapter 71, Acts of the Legislature, 1935, as amended by Chapter 158 of said Acts, 1947, and as promulgated by the West Virginia Racing Commission, created by the original act, and in force and effect in the month of April, 1949, during which month there occurred

the events with which this proceeding is concerned. In this opinion we will deal only with the Act of 1935, as the 1947 Amendments thereto do not cover any question here involved.

By Section 1 of the 1935 Act, aforesaid, there was created the West Virginia Racing Commission, hereafter referred to as "Racing Commission", with the provisions that it should be a corporation, with power, as such, to contract and be contracted with, and to consist of three members to be appointed by the Governor, by and with the consent of the Senate. The section then provides:

"* * * Said commission shall have all the powers necessary to carry out fully and effectively all the purposes of this act and shall have full power to prescribe rules, regulations and conditions under which all races shall be conducted within the state of West Virginia. The commission may at any time for the violation of any rule or for any fraudulent practices, require the removal of any official or employee employed by any licensee hereunder, and shall have power to summon witnesses and to administer oaths or affirmations to such witnesses and take testimony whenever in the judgment of said commission it may be necessary for the discharge of its duties. False swearing on the part of any witness shall be deemed perjury and shall be punished as such."

Section 11 of the Act provides:

"The commission may license jockeys, trainers and grooms, register colors, assumed names, apprentice contracts, authorized agents, and charge a fee therefor. * * *".

Acting under the general authority aforesaid, the Racing Commission adopted and promulgated certain rules governing the conduct of horse racing under the act, to which all persons desiring to race horses were required to subscribe, as a prerequisite to the granting of any

license or privilege therefor. The general purpose of the act was to legalize horse racing under what is known as the pari-mutuel system, to be conducted under the supervision and control of the State through the Racing Commission created by the act. These regulations were very broad and comprehensive, and presumably covered every feature of horse racing permited under the act. Here we are only concerned with such rules so far as they pertain to fraudulent and corrupt practices. Under the heading "Corrupt Practices" Rules Nos. 245, 246, 247, 247-A, 248, 249 and 249-A were so adopted and promulgated and they read as follows:

"No. 245—No narcotic, stimulant or drug shall be used, no drench of anything shall be administered, and no electrical, mechanical or other appliances other than the ordinary whip shall be used for the purpose of stimulating the horse or affecting his speed in a race. Any person so offending shall be suspended for not less than six (6) months, and also any horse showing positive from a saliva test or urine test, containing drugs or stimulant shall be disqualified, and the case referred to the West Virginia Racing Commission for any further action deemed necessary."
"In cases where a saliva or urine test shows a positive analysis, the trainer shall be given a hearing before any announcement is made of any penalty imposed."

"246. Any owner, trainer, foreman, groom, stable employee or other person connected with any stable found with any narcotic drug in his possession while upon the grounds of any of the tracks under the jurisdiction of the West Virginia Racing Commission shall be ruled off, and such possession shall be deemed sufficient evidence for such ruling without further proof."

"247. Every owner or his authorized agent or trainer of any horse or horses entered to race on any race track licensed by the Commission to operate a race track, shall immediately at any time when requested by the Commission or any

of its agents or employees, submit any horse or horses, of which he is the owner or authorized agent or trainer to any veterinary surgeon designated by the Commission for such examination or tests as said veterinarian may deem advisable to make."

"247-A. (a) Any trainer who injects, gives, uses or administers any drugs or medicines of any kind whatsoever, or who authorizes, allows or permits any other person to give, inject or administer any drugs of any kind whatsoever to a horse within forty-eight (48) hours prior to the running of a horse race, must give notice of the use, injection or administering of said drugs or medicines prior to the running of said race. Any trainer failing to give such notice may be suspended or his license revoked."

"(b) If a horse is scratched as a result of such medication, said horse cannot be entered again for five (5) racing days."

"248. The saliva of the winner of each and every race shall be taken, and from such other horses as the Stewards may direct. In all such cases the trainer shall be held responsible for the condition of his horse or horses, except in case of unavoidable absence of the trainer, when the stable foreman or groom in charge of the horse or horses shall be held responsible, and in the event of the horse or horses from which said saliva has been taken shall have been found by the Chemist to show evidence of the administration of narcotics, said responsible person so offending shall be suspended for not less than six (6) months and the case referred to the West Virginia Racing Commission for any further action deemed necessary."

"Any urine test may be taken of any horse or horses that the Stewards may ask the Veterinarians in charge to take and have analyzed, and if found positive, the responsible person so offending shall be suspended for not less than six (6)

months and the case referred to the West Virginia Racing Commission for any further action deemed necessary."

"249. The veterinarian, as soon as possible, shall send or deliver to the chemist designated by the West Virginia Racing Commission a sample of such saliva and/or urine for analysis, and said chemist shall report to the Stewards the result thereof. Should the report of such chemical analysis disclose a positive result indicating a narcotic, stimulant or drug has been administered, or should any chemical analysis of other excretions or body fluids taken from any horse which has run in any race disclose beyond doubt that a narcotic, stimulant or drug has been used, any person so offending shall be punished at the discretion of the Stewards, by suspension of not less than six (6) months."

"249-A. Any purse won by a horse found to have been stimulated, shall be returned and the same, upon its return, shall be redistributed as if said horse had been disqualified. The suspension against a horse and against the person or persons responsible for his stimulated condition, shall not be terminated at the end of the period imposed by the Stewards, or by the Commission, unless the sum won by the horse is returned."

The events leading up to the institution of this proceeding are stated in relator's petition. This petition was filed on July 6, 1949, in which the relator averred that she was a duly licensed and recognized trainer of thoroughbred horses, said license having been issued to her, approved by the West Virginia Racing Commission, on April 11, 1949, and that she was licensed by a number of other state racing commissions, including the states of New York, Maryland, Rhode Island and New Jersey; that she was the owner of a number of thoroughbred horses which she trained for herself, and was also engaged as a trainer of such horses for many other people; that she was the owner of a valuable breeding establish-

ment in the State of New Jersey, and that she had never deviated nor permitted any of the employees to deviate from the best and highest standards of ethics and sportsmanship in the operation of her racing establishment. The petition then alleged the existence of the West Virginia Racing Commission, naming the members thereof, and copied that part of Section 1 of Chapter 71, Acts of the Legislature, 1935, quoted above, and alleged the promulgation by the West Virginia Racing Commission of the rules governing corrupt practices quoted above. The petition then averred that the said Racing Commission issued permits for the conduct of the spring meeting by the Charles Town Jockey Club, of Charles Town, West Virginia, from April 11 to May 5, 1949, and for subsequent periods, and that the relator sent five horses to the race track of said Jockey Club, and was assigned stables in which to quarter said horses during the race meetings; that she entered different horses, from time to time, in various races for which they were conditioned and qualified. Also, that the stables in which said horses were quartered were owned and maintained by said Jockey Club, and were under the control and supervision of the Racing Commission, which had appointed stewards, inspectors, and various other officials to enforce the rules and regulations of the commission, and to take necessary measures to safeguard and protect the rights and property of the various owners and trainers, including the relator, and that one of the rules adopted by the said Racing Commission in the year 1946 and in force in the month of April, 1949, provided that:

> "During each and every race meet, twenty-four (24) hour competent police protection must be maintained at the barns to detect and prevent fires, if possible; to see that no gambling occurs on the grounds; to see that horses are not tampered with; nor any other act in violation of the rules of the West Virginia Racing Commission or detrimental to the best interest of racing is committed."

And the petition averred that such protection was not furnished by such Racing Commission, but on the contrary the barns, and roadways around the barns, were open to the general public, and there was no way by which it was possible to keep the general public from going to the barns and tampering with the horses therein.

The petition then averred that for many years it had been the practice of the Racing Commission to take samples of the saliva of winners of races at the various race tracks in the State, including the track of Charles Town Jockey Club, and that on occasion samples were taken from horses other than the winners; that under Rules 245 to 249-A, adopted by the Racing Commission, the urine test mentioned therein was required, and first put into effect at the Charles Town Jockey Club during the winter meeting held in December, 1948; that such practice of taking urine samples was continued during the first portion of the spring meeting held beginning April 11, 1949, and continuing until May 5, 1949; that saliva and urine samples were sent to the Smith Chemical Laboratory in Louisville, Kentucky, for the purpose of having such samples analyzed; that on April 23, 1949, samples of saliva and urine were taken daily after each race and that among the samples of saliva and urine taken from the horses which participated in the racing on that day was a urine sample taken from a horse owned and trained by relator named Sunset Boy, which horse had won the first race on that day; that the test of such sample of urine taken from said horse showed a positive reaction, and as a result thereof the stewards of the said Charles Town Jockey Club suspended the said Elsie S. Morris and the horse Sunset Boy for six months from April 30, 1949, and the case was referred to the West Virginia Racing Commission; and, following this action, there was a redistribution of the purse in which the horse Sunset Boy was not permitted to participate. The petition alleged that the effect of such suspension of the said relator, as owner-trainer, was to suspend her not only from race tracks in the State of West Virginia, but from all other

tracks in the United States, and that the disqualification of the horse Sunset Boy followed automatically throughout the United States. The petition then averred that nine other owner-trainers and trainers were suspended for a like reason on account of the races conducted during the week beginning April 23, 1949.

The petition then alleged that an appeal from the ruling of the stewards to the State Racing Commission was provided for under Rule No. 74, of the rules promulgated by said Racing Commission, and that under said rule a hearing was had on such appeal on May 20 and 21, 1949, at which testimony was offered, a transcript of which was filed with relator's petition and asked to be considered as a part thereof. The petition shows that on May 25, 1949, the Racing Commission made a ruling sustaining the action of the stewards as to the suspension of the relator, Elsie S. Morris, but provided that the suspension imposed upon the horse Sunset Boy should terminate when and if a bona fide sale of said horse, approved by the stewards, had been made. The redistribution of the purse was confirmed and approved.

By paragraph 17 of the said petition it is alleged:

"It developed at the hearings held before the defendants that the alleged 'drug' discovered in the urine sample said to be taken from the horse Sunset Boy on April 23, 1949, was atropine, hyoscyamine or hyoscine and possibly procaine, or possibly some other drug. The evidence taken before the Commission did not show and the Commission witnesses were unable to give any idea of the quantity involved, nor the time within which said drugs were administered to said horse prior to his running in the fourth race on April 23, 1949, so that this petitioner does not know whether the analysis was erroneous, in not being advised of the exact conditions under which the analysis was made, or whether the samples were in some way contaminated between the time that they were taken from the horse on said day and the time it reached the laboratory of the chemist

designated by the West Virginia Racing Commission to make the analysis."

The petition then averred that the provisions of Rule No. 248, quoted above, violated the spirit and letter of the Bill of Rights of the Constitution of West Virginia as defined in Article III, Section 10 thereof, and also Article V of the Constitution of the United States, and Section 1 of the Fourteenth Amendment to said Constitution, for the following reasons:

"* * * The powers vested in the West Virginia Racing Commission to prescribe rules and regulations authorize it to adopt reasonable rules and regulations, proper and necessary for the objects to be attained, uniform in application and without discrimination against any person or property. The said West Virginia Racing Commission and the Members thereof seek to enforce a rule under which the person charged is not permitted to offer any defense. The defendants have arbitrarily, capriciously and illegally singled out the trainer to bear the burden of the result of an analysis made by persons and at times and places and under conditions unknown to him, and to subject such person to penalties whether he committed any offense or not. Rule No. 248 does not permit the Commission to absolve the trainer even if the Commission should ascertain that the violation was committed by some other person or persons, for, under the provisions of this Rule, the trainer must be penalized, even if his innocence be established, and even if some other persons committed the offense and *is* known to the Commission. Under the provisions of this Rule, the Commission may, as it proposes, penalize the trainer who is the plaintiff in this case, and make no further inquiry as to whether an offense was actually committed and, if so, who actually was responsible. Said Rules of the West Virginia Racing Commission do not provide for any right of appeal or review by any Court of competent jurisdiction and for that reason, the authority granted the West Virginia Racing

Commission constitutes an unconstitutional delegation of legislative power and vests in the Commission, an administrative body, an arbitrary and uncontrolled discretion. For those and other reasons, said rule is not authorized by law, and is utterly nugatory, null and void and of no effect whatsoever either in law or equity."

The relator denied that she ever administered, or knowingly or carelessly permitted any drug to be administered, to the horse Sunset Boy, and that her reputation as an honest and loyal citizen was being impaired because of the unfounded charges made against her under invalid rules and regulations; that her expense, loss and injury would continue and be materially increased unless her rights be safeguarded by this Court; and that being denied a full and fair opportunity to prepare her defense before the West Virginia Racing Commission, she was deprived of any adequate remedy at law.

The prayer of the petition is that the findings made against relator, under the terms of which the license issued to her by the West Virginia Racing Commission was revoked, be set aside, and that said commission be required to reinstate said license.

On this petition the rule in this proceeding was awarded, on July 8, 1949, returnable July 25, 1949. On the return day respondents appeared. Beverly Broun having terminated his connection with the West Virginia Racing Commission, as of July 15, 1949, the case was, on his motion, dismissed as to him. A stipulation of the waiver of paragraphs 15 and 19 was filed, and there was also filed the joint answer of the Racing Commission, and Frank J. Brooks and M. M. McIntire, members thereof. By this answer the respondents admitted all facts well pleaded in relator's petition, except the allegations in paragraph 17 quoted above, and, as to that paragraph, the respondents denied the allegations therein contained; denied that the analysis of the urine sample taken from the horse Sunset Boy was erroneous, or that said sample was in any way

contaminated before analysis; and averred that this was adequately shown by the evidence contained in the record of the hearings before the West Virginia Racing Commission aforesaid. The answer averred that the rules and orders promulgated by the West Virginia Racing Commission, by virtue of authority vested in said commission by the Legislature of the State of West Virginia, did not in any way deprive relator of any constitutional rights under the Constitution of the State of West Virginia, or the Constitution of the United States.

We have gone into considerable detail in outlining the allegations of the relator's petition, and the answer of the respondents thereto, in order to make clear the single issue here presented, namely, whether the rules and regulations promulgated by the West Virginia Racing Commission, and especially Rule No. 248 quoted above, and under which the commission acted, violated Section 10 of Article III of our State Constitution, or Article V of the Federal Constitution, or Section 1 of the Fourteenth Amendment thereto. That the issue is so confined is made manifest by a consideration of the testimony taken on the hearing before the commission, and exhibited with and asked to be made part of relator's petition. This testimony fails to create any doubt on the finding of the commission that the horse Sunset Boy had been drugged immediately prior to the race he ran and won on April 23, 1949. On the other hand, no effort was made to show that the relator administered the drug, or was, in fact, in any way connected with the act by which the drugged condition of the horse came about. Furthermore, no testimony or other type of proof in the record throws any light on who was factually responsible for the condition of the horse. The position of the Racing Commission is that the promulgation of Rule No. 248 constituted a valid exercise of the regulatory powers of the commission, delegated to it by the Legislature, and that, under said rule, the responsibility for the condition of any horse permitted to be raced on any track within the control of the commission rested solely on the trainer, or, in his unavoidable absence, on

the stable foreman or groom in charge. As the case is presented to us, if Rule No. 248 is valid under our Constitution and statutes, the ruling of the Racing Commission complained of must be sustained, and the writ prayed for denied; if, however, such rule be held invalid, under the test aforesaid, the Racing Commission exceeded its powers, its ruling was never operative, and the writ prayed for must be awarded.

Before proceeding to discuss this controlling question, we refer to the question of the supposed effect of the drug administered to the horse Sunset Boy. He won the race on April 23, 1949, and from that fact it is natural to assume that the drug administered had a stimulating effect. The evidence is that the sample of urine taken from Sunset Boy was numbered 6640, and that it was found by the chemist of the commission "to contain Atropine, Hyoscyamine or Hyoscine and possibly some other drug." The record contains testimony to the effect that the specific drugs mentioned might have had a depressing rather than a stimulating effect upon the horse. We think that the nature of the effect of the drug administered is unimportant in this case. Rule No. 245, aforesaid, contains this language:

> "No narcotic, stimulant or drug shall be used, no drench of anything shall be administered, and no electrical, mechanical or other appliances other than the ordinary whip shall be used for the purpose of stimulating the horse or affecting his speed in a race. * * *".

It is evident that the evil sought to be prevented was to avoid either stimulating or depressing a horse, because whatever the effect, the awarding of the purses, and the wagers on the results of the races, would be affected.

This brings us to Rule No. 248, quoted above. The purpose of the Racing Commission in promulgating Rules Nos. 245 to 249-A, both inclusive, was a laudable one,

namely, to avoid, so far as possible, the use of medicine or drugs which might affect the normal ability of a horse to run in a race intended to be conducted under rules of honesty and fairness. In effecting such a result, in the peculiar circumstances under which horses are trained and prepared for racing, responsibility for the condition of a horse when he enters a race must, of necessity, be placed somewhere. To leave any doubt on that point would be to make ineffective all efforts at regulation, and all attempts to assure fairness in horse racing. It goes without saying that the State, having assumed, under its police powers, full and complete control of all horse racing conducted under the pari-mutuel system, became morally responsible to insure, so far as possible, that no fraud or deceit would be practiced in an enterprise over which it had assumed control. Therefore, the Legislature, in enacting the racing statute, realized the importance and necessity of the power of regulation of racing, and gave to the Racing Commission, set up thereunder, full and complete powers of regulation. The language is broad and general; but it is assumed that it was intended to apply to all problems affecting horse racing, without going into particular detail, or without attempting to set up any particular standards under which the commission might act.

There cannot, in our opinion, be any doubt as to the power of the Legislature to regulate horse racing, nor does there seem to be any contention on that point. Whatever may be said in favor of horse racing, and much can be said, it must be admitted that great evil attends its practice, such as calls for the intervention of the State, under its police power, to the end that such evil be minimized so far as it is possible to do so. This intervention and control is exercised under the police power of the State, and the use of that power rests with the Legislature. The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, or natural right, which, in effect, is unlimited. The Legislature being the depository of this power, may delegate it to boards and commissions and, as a general rule, should set up

standards for the guidance of such boards and commission in the use and application of the power granted. However, there are exceptions to this requirement. The execption to the rule is well stated in 42 Am. Jur. 345, wherein it is stated:

"* * * The rule requiring an express standard to guide discretion is recognized as properly applied to statutes or ordinances regulating ordinary lawful activity, but to be subject to the exception that where it is impracticable to lay down a definite comprehensive rule, such as where the regulation turns upon the question of personal fitness or where the act relates to the administration of a police regulation and is necessary to protect the general welfare, morals, and safety of the public, it is not essential that a specific prescribed standard be expressed. * * *".

This statement is supported by the ruling of this Court in *West Central Producers Co-Operative Association v. Commissioner of Agriculture*, 124 W. Va. 81, 20 S. E. 2d 797, and *State v. Bunner*, 126 W. Va. 281, 27 S. E. 2d 823. In the very nature of things, no usable standard can be set up for the promulgation of any of the regulations under which horse racing may be conducted, and especially to guard against fraud and deceit. Then, the granting of a license to train and race horses is the grant of a privilege, as distinguished from a right which once granted cannot always be withdrawn. In *Hinebaugh v. James*, 119 W. Va. 162, 192 S. E. 177, this Court said: "There is no inherent right in any individual, whether he be a citizen or not, to engage in a business which the state, in the exercise of the police power, has placed under surveillance and permits only as a privilege or franchise." And in *Nulter v. State Road Commission*, 119 W. Va. 312, 193 S. E. 549, we held, first, that "The police power of a state is the power of government inherent in every sovereignty to enact laws, within constitutional limits, to promote the general welfare of its citizens. The Fourteenth Amendment of the Federal Constitution does not impair the police power of a

state."; and then held: "The operation of a motor vehicle on the public highways is not a natural right, nor is license to do so a contract, or property right, in a constitutional sense. The license is merely a conditional privilege." Surely these cases, by analogy, uphold the principle that a license issued by the State to train and race horses, under a statute assuming to regulate and control horse racing, enacted under its police power, is nothing more than a privilege which the State may, for good cause, revoke or withdraw. Furthermore, it is generally held that the power vested in a board or commission to issue a license for the exercise of a privilege implies the power to revoke such license for good cause. A general statement of this principle appears in 53 C. J. S. 649, as follows:

> "A license may be revoked for due cause at any time in accordance with provisions in the licensing act or ordinance or in the certificate of license. A license may also be revoked in the exercise of the police power of the state, whether or not the power to revoke is expressly or impliedly reserved in the licensing statute or in the certificate of license."

We are of the opinion, therefore, that the grant of regulatory power made to the West Virginia Racing Commission by the Legislature, in the exercise of its police power, was legal and valid; and that in consideration of all the circumstances surrounding the establishment and operation of race tracks, and the racing of horses thereon, the Racing Commission, in the promulgation of Rules Nos. 245 to 249-A, both inclusive, did not exceed the power so granted. Admittedly the said rules, especially Rule No. 248, constitute a harsh exercise of power, but in the circumstances, under which some rule fixing responsibility would seem to have been imperative, we think it was a necessary and valid exercise of power. As stated above, the power to assure fairness in racing must rest somewhere, and responsibility therefor must be definitely fixed, if any practical results are to be expected. Placing that responsibil-

ity on trainers or owner-trainers may, in some instances, result in injustice; but a necessary rule of public policy cannot, in all cases, assure exact justice. No one, we assume, will contend that the drugging of race horses, in such a way as to affect the result of a race, is not an evil which must be scotched wherever present, and by any reasonable and adaptable method. Making the owner-trainer or the trainer responsible for the condition of his horse when it enters a race is one way, and perhaps the best way, of assuring the racing authorities, and the track patrons, that the race will be fair. In our opinion, a rule which so provides cannot be held to be unreasonable or in violation of any statutory or constitutional right. It may be that in the case at bar the rule admits the imposition of a penalty without fault; but, in the exercise of the police power, this can be done under the general theory of broad public policy which makes it necessary to do so in certain situations. Such authority in the Legislature has been recognized in this state. See *Prager v. Chapman & Sons*, 122 W. Va. 428, 9 S. E. 2d 880. See also *City of Chicago v. Sturgis*, 222 U. S. 313.

The question of the validity of a closely similar rule was considered by the Supreme Court of Maryland in *Mahoney v. Byers*, 48 A. 2d 600. The Maryland Racing Commission had promulgated certain rules and regulations which, among other things, provided that no person should administer, or knowingly or carelessly permit to be administered, to any horse entered for a race, any drug within forty-eight hours before the time of the race. Another rule provided:

> "If the Commission finds from analysis of the saliva or urine, or blood taken from a horse on the day of a race in which the horse ran, or from other competent evidence, that any drug has been administered to ·the horse within forty-eight (48) hours before the race, the trainer shall be subject to the penalties prescribed in sub-section (4) hereof, whether or not he administered the

> drug, or knowingly or carelessly permitted it to be administered. The fact that the analysis shows the presence of a drug shall be conclusive evidence either that there was knowledge of the fact on the part of the trainer or that he was guilty of carelessness in permitting it to be administered."

For violation of this rule the license of a trainer was suspended for one year, and in a mandamus proceeding, instituted for the purpose of restoring the trainer to good standing, the Court reversed the ruling of the Racing Commission. In that case it was held that: "A rule of the racing commission that presence of drugs in saliva, urine or blood of race horse on day of race shall be conclusive evidence either of trainer's knowledge or carelessness, is void.", and it was also held that: "The Commission, therefore, cannot set up in a rule an irrebuttable presumption and treat it as if it were a prima facie presumption." It will be noted that the Court invalidated the rule on the theory that the rule provided that the mere fact that a horse was drugged created a presumption, which could not be rebutted, that the drug had been either administered by the trainer, or that he had knowingly or carelessly permitted it to be administered, and it was, in fact, held that this prevented the trainer from making any defense, and was an unconstitutional exercise of power by the Legislature and the Racing Commission.

The Maryland case was followed in *State v. Waldron* (Fla.) 31 S. 2d 627. The rules promulgated by the State Racing Commission of Florida prohibited the administration of drugs and provided that:

> "The trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of the acts of a third party. Should the chemical or other analysis of saliva or urine samples or other tests prove positive, showing the presence of any narcotic, stimulant, chemical or drug of any kind or descrip-

tion, the trainer of the horse may be suspended or ruled off, and in addition, the foreman in charge of the horse, the groom and any other person shown to have had the care or attendance of the horse may be suspended or ruled off in the discretion of the Commission, and for a like second or subsequent finding shall be ruled off."

Under this rule, a trainer was suspended by the Racing Commission and, upon a test of such rule in a mandamus proceeding, the Supreme Court of the State of Florida reversed the ruling of the Racing Commission and held the rule quoted above to be invalid, and the suspension of the trainer to be void, under authority of the Maryland case referred to above. While the rule promulgated by the Florida Racing Commission did not refer to the matter of presumption, the Court, in deciding the case, based its decision largely on the theory that a trainer had been deprived of his right to rebut a presumption and follows closely the argument of the Maryland Court. It is true that in the Florida case it was held that the rule making a trainer the absolute insurer of the condition of horses entered in a race denied the trainer the benefit of due process of law and, naturally, that is the general principle upon which both the Maryland and Florida cases were decided.

If we followed the ruling of the Maryland and Florida cases, we would be driven to the granting of the peremptory writ of mandamus prayed for in the case at bar. There is no substantial difference in the rules under which these cases were decided and Rule No. 248 adopted by the West Virginia Racing Commission. In substance they are the same and intended to obtain the same result.

However, a similar rule has been considered by the Supreme Court of California in the case of *Sandstrom v. California Horse Racing Board,* 189 P. 2d 17. In that case the rule under consideration read as follows:

"The Trainer shall be the absolute insurer of and responsible for the condition of the horses

entered in a race, regardless of the acts of third parties. Should the chemical, or other analysis of saliva, or of urine samples, or other tests, prove positive, showing the presence of any narcotic, stimulant, chemical, or drug of any kind or description, the Trainer of the horse may be suspended or ruled off, and in addition, the Foreman in charge of the horse, the Groom signing the Pre-Race Examination Slip and Paddock Certificate, and any other person shown to have had the care, or attendance, of the horse may be suspended or ruled off, in the discretion of the Board.",

which, as will be noted, is, in effect, the same as Rule No. 248 adopted by the Racing Commission of this State. In that case the Court held that:

"Rule of the Horse Racing Board providing that a trainer shall be absolute insurer of condition of horses entered in a race in which there is wagering, regardless of acts of third parties, and that he may be suspended, if tests show presence of stimulants, is not unreasonable, arbitrary or capricious so as to constitute a denial of due process of law."

In the body of the opinion the Maryland and Florida cases, above cited and discussed, and the New York case of *Smith v. Cole,* were referred to in this language:

"As applied to the present controversy, the foregoing three case are not controlling. While the suspension was upheld in Smith v. Cole, supra, 270 App. Div. 675, 62 N. Y. S. 2d 226, there was evidence that the trainer was knowingly responsible for the treatment. There was no such evidence here. The rule considered in Mahoney v. Byers, supra, Md., 48 A. 2d 600, substituted an irrebuttable presumption for an essential fact. Thus evidence was made conclusive which was not so of its own nature and inherent force. In the case at bar liability is not predicated on administration of the drug nor on the failure to exercise due care, and the presence or absence

thereof would neither add nor detract. State v. Baldwin, supra, Fla., 31 So. 2d 627, would at first appear persuasive since Rule 117, there considered, somewhat parallels Rule 313 now under attack. But that case did not consider the power of a state to impose strict liability, the existence of which is the fundamental basis of our determination. Also, it would appear that the decision in the Baldwin case was influenced decisively by analogy to Mahoney v. Byers, supra, Md., 48 A. 2d 600, where the mechanics rested in the employment of a presumption as conclusive evidence."

Notwithstanding this attempted distinction, it seems clear to us that, in substance, there is a distinct conflict as between the ruling of the Maryland and Florida Courts, on the one hand, and the California Court on the other. The decision in *Mahoney v. Byers, supra,* was without dissent. In *State v. Baldwin, supra,* in the original opinion filed in the case the writ of mandamus prayed for was denied; but on rehearing it was granted by the vote of four Justices, there being a dissent from such ruling on the part of three Justices. And in *Sandstrom v. California Horse Racing Board, supra,* there was a dissent on the part of one Justice. It should be stated, however, that an application for certiorari, in the California case, to the Supreme Court on the United States, was denied on October 11, 1948, 69 S. Ct. 31.

The *Sandstrom* case, *supra,* was based upon an Act of the Legislature of the State of California enacted in 1933, which granted full power to prescribe rules, regulations and conditions covering the conduct of horse racing where there was wagering, and by proviso therein provided that the act should not become effective until the people should ratify a constitutional amendment approving the same. In June, 1933, at an election held in said State, an amendment to the Constitution was adopted which provided that: "The Legislature may provide for the regulation of horse races and horse race meetings and wagering on the

results thereof.", and then provided that the statute aforesaid was confirmed, ratified and declared to be fully and completely effective, with the proviso that said act might at any time be amended or repealed by the Legislature. It appears to be contended that these proceedings in California provide some foundation for the holding of the Supreme Court of that State contrary to the holdings of the like Courts in Maryland and Florida; and that, there being no such constitutional provision in West Virginia, we are not justified in following the *Sandstrom* case. We are unable to follow this line of reasoning. As indicated above, our Legislature has undertaken to regulate horse racing, under its police power, which is a power separate and distinct from any Constitution, and is in no wise limited thereby, unless directly, or by necessary implication, restricted by some provision of the State or Federal Constitution.

> "The police power is an attribute of sovereignty and a necessary attribute of every civilized government. It is a general term used to express the particular right of a government which is inherent in every sovereignty. Consequently, it is inherent in the states of the American Union, possessed by every one of them as sovereign, and is not a grant derived from or under any written Constitution. * * *." 11 Am. Jur. 966.

> "The police power under the American constitutional system has been left to the states. It has always belonged to them and was not surrendered by them to the general government or directly restricted by the Constitution of the United States. It has repeatedly been held that no provisions of the Federal Constitution and none of the amendments added to that instrument were intended or designed to interfere with the police power of the various states.

> "Each state has the power therefore to regulate the relative rights and duties of all persons, individuals, and corporations within its jurisdiction for the public convenience and the public

good. The only limit to state exercise of power in the enactment of police laws is that they shall not prove repugnant to the provisions of the state or national Constitution." Id., page 986.

This doctrine is not new nor, so far as we know, has it ever been questioned. We think it may be said that it had its origin in the famous Slaughter House cases, 16 Wallace 36, and, from that day to this, courts have consistently protected the States in their right to the exercise of the police power. See Brannon's. The Fourteenth Amendment, 168; Cooley's Principles of Constitutional Law, 250; *Nulter v. State Road Commission, supra.*

The State of West Virginia being in full possession of its police power, the Legislature, as a depository of that power, had the right to enact legislation for the regulation of horse racing; had the right to delegate that power to the State Racing Commission; and the promulgation of the rules and regulations with which we are now concerned, was an exercise of the State's power lawfully and legally delegated. The questions of presumption, whether irrebuttable or otherwise, are not here involved. What is involved is the power of the State to make a particular rule or regulation which it deems necessary for the morals and protection of the public good of the State and its people. The right to engage in horse racing, upon the results of which wagers may be made, is not a natural right, and is nothing more than a privilege upon which the State, in granting the same, may impose restrictions and conditions. The simple proposition is that in permitting horse racing in this State, and in permitting wagers thereon the Legislature has weakened in its battle against gambling and all wagers. As enacted, our racing laws delegated the management thereof to a Racing Commission, and gave it complete power to adopt rules and regulations therefor. In doing so it has chosen to impose upon the owners and trainers of horses entered for racing absolute responsibility as to the condition of the horses. There is no question of any presumption involved. It is a

plain exercise of naked, but necessary, power to control a business which, in its very nature, requires strict control. We cannot assent to the proposition that the privileges and immunities of citizens of the United States, under the Fourteenth Amendment to the Constitution of the United States, or otherwise, shall be so far extended as to destroy the power of the State to exercise its police control over horse racing, and other activities, requiring strict regulation in the interests of the common good.

After giving mature consideration to the question presented in this case, we conclude that the principles announced in *Sandstrom v. California Racing Board, supra,* should be followed and applied. As above stated, we think it imperative that, in the conduct of racing in this State, under the authority of the State, delegated to its Racing Commission, there should and does exist the power to make rules which will effectually guard against fraud and deception in racing, which may be effected through administering drugs or narcotics, or by any other means. That the danger of such practices exists cannot be denied, and that the future of racing depends upon the elimination of such practices, as far as possible, must be obvious to everyone. Firm and rigid rules in the placing of responsibility seem to be absolutely necessary. Other methods might operate to partially prevent such practices, such as police protection; but, when all is said and done, the most effective method of bringing about fairness in racing is to place responsibility for the condition of horses upon their owner or trainer, who ordinarily has the greatest interest in seeing that his horse is not barred from the race, or barred from participating in a purse offered for the race. Aside from this, is the implied undertaking, on the part of the State, that patrons of race tracks who, under the pari-mutuel system, make wagers on horse races, shall be given assurance that they will not be deprived of their money through fraudulent practices. Every consideration surrounding the business of operating a race track, and the racing of horses thereon, seems to us to call for firm and rigid rules placing responsibility

and imposing penalties for their violation. Conceding that the rule adopted by the West Virginia Racing Commission is harsh and may, in some instances, result in injustice to innocent people, we think the rule can be justified on the grounds of public policy, because it is the only effective means by which fraud and deceit in connection with horse racing can be minimized. Without such a rule, or its equivalent, racing in this State would be thrown open to the practices of those who engage in unfairness and deceit, and the State would be connected with racing enterprises in which it could not be assumed that any race would be fair.

In view of these circumstances, we cannot say that Rule No. 248, particularly complained of, constitutes an improper exercise of the police power of the State by the Racing Commission, under the powers delegated to it by the Legislature.

Holding these views, the peremptory writ of mandamus prayed for is denied.

*Writ denied.*

RILEY, JUDGE, dissenting:

With deference I dissent from the majority opinion. In so doing I am well aware that the State may by statute regulate and even prohibit horse racing under its broad and inherent police power; that horse racing *ex necessitate* is apt to lend itself to fraud on the public and therefore it is a fit subject for state regulation; and I agree with the majority opinion that Chapter 71, Acts of the Legislature, 1935, creating the West Virginia Racing Commission and delegating to the Commission "the full power to prescribe rules, regulations and conditions under which all races shall be conducted within the state of West Virginia" is constitutional and within the scope of the State's police power. Nevertheless, I dissent from the majority opinion.

In the first place, Rule No. 248 as applied by the commission and approved by this Court in the majority

opinion and in the syllabus thereto, is inconsistent with the inhibitory provisions of Rule No. 245. Rule No. 248 simply provides the effect which the presence of deleterious drugs found in the saliva or urine of a horse shall have on the question of the revocation of the trainer's license. But Rules Nos. 245 and 247-A (a) alone provide the conditions under which and the extent to which narcotics, stimulants or other drugs may not be administered to a horse. Rule No. 245 specifically provides that "No narcotic, stimulant or drug shall be used * * * *for the purpose of stimulating the horse or affecting his speed in a race."* (Italics supplied.) Rule No. 247-A (a) provides that any trainer who, without notice to the track authorities, administers or permits to be administered to any horse any drugs or medicines of any kind whatsoever within forty-eight hours prior to the running of a horse race may be suspended or his license revoked.

The record made at the hearing before the commission contains no evidence that "atropine, hyosciamine or hyoscine, and possibly procaine, or some other drug" claimed by the commission to have been injected in the horse, Sunset Boy, was so injected "for the purpose of stimulating the horse or affecting his speed in the race." The record discloses that the drugs found in the horse's urine as a result of a chemical analysis were depressants. Dr. William E. Trussell, track veterinarian of the Charles Town Track, a witness for the commission, and Dr. William R. Humphrey, who had been associated with his father, an experienced veterinarian, called by the relator so testified. Dr. Humphrey testified:

"Q. What effect would the three medicines referred to, or either of them [atropine, hyoscyamine and hyoscine], have upon a horse's ability to run?

"A. In the therapeutic dose, I think it would slow him down.

* * *

"Q. How would it slow the horse down Doctor?

"A. Well, it would dry up the saliva and make his respiration to the horse feel sort of hard and dry.

"Q. Are either one of these medicines classified as a stimulant?

"A. They are depressants, all three of them.

"Q. Not stimulants?

"A. Sedatives or depressants, whatever you want to call them."

But notwithstanding this evidence, the horse, Sunset Boy, led the field in the race immediately before the urine sample was obtained. In the light of this evidence it is quite difficult to say that the drugs in question were used "for the purpose of stimulating the horse or affecting his speed in the race." Moreover, Rule No. 247-A (a) seems to prohibit the injection or use of drugs by a trainer, and the relator is a trainer, within forty-eight hours of the race in which the horse is to run without notice to those in authority. Subsection (a) of Rule No. 247-A reads: "Any trainer who injects, gives, uses or administers any drugs or medicines of any kind whatsoever, or who authorizes, allows or permits any other person to give, inject or administer any drugs of any kind whatsoever to a horse within forty-eight (48) hours prior to the running of a horse race, must give notice of the use, injection or administering of said drugs or medicines prior to the running of said race. Any trainer failing to give such notice may be suspended or his license revoked."; and there is no evidence in this record bearing on the question when or by whom the drugs, found in the urine of the horse, were administered. Nevertheless, the commission suspended the relator's license for a period of six months which, in my opinion, is a revocation *pro tanto* and served to disqualify her, as well as her horses, in this and several other states,

including the State of New Jersey, where this record discloses she maintains at great expense a training stable for the purpose of training not only her own horses but the horses belonging to other owners. In my opinion, the order of the commission in disqualifying the relator and her horses was arbitrary, unwarranted and capricious, and in contravention of the very rules framed and promulgated by the commission for the purpose of regulating horse racing in West Virginia.

But the commission evidently contends in this proceeding, and its contention is sustained by the majority opinion, that under Rule No. 248 it is unnecessary to prove: (1) That the drugs found in the urine of the horse Sunset Boy were injected into the horse for the purpose of stimulating the horse or affecting his speed in a race; and (2) the drugs were injected without notice to the track authorities within forty-eight hours of the race. It is asserted by the commission and in the majority opinion that Rule No. 248 imposes upon the trainer the absolute responsibility for the condition of the horse or horses under his charge as such trainer, except in cases of unavoidable absence, and that the mere showing of evidence of the administration of drugs will subject such trainer to suspension for not less than six months. Rule No. 248 was framed and promulgated by the commission, as the majority indicates, under the police power of the State. While relator's license is not a property right, it is, in my opinion, a valuable privilege though conditional in its nature that cannot be taken away, notwithstanding the broad police powers residing in the State without just cause. Whether this rule provides that the mere presence of drugs in the system of a horse imposes absolute liability on the trainer or creates a conclusive presumption establishing liability, the legal result is the same. In either event the relator is precluded from establishing a just defense. The rule, as applied by the commission and approved in the majority opinion is, in my judgment, violative of the Fourteenth Amendment of the Constitution of the United States, and Article III, Section 10, of the Con-

stitution of West Virginia. Said Section 10 of the West Virginia Constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." I am well aware, as held in *State v. Bunner*, 126 W. Va. 280, 27 S. E. (2d) 823, that the police powers of the State did not originate in the Constitution, and that such powers *properly exercised* constitute due process. *City of Chicago v. Sturges*, 222 U. S. 313, 322, 32 S. Ct. 92, 56 L. ed. 215. In the latter case the Supreme Court of the United States said: "If such legislation be reasonably adapted to the end in view, affords *a hearing* before judgment, and is not forbidden by some other affirmative provision of constitutional law, it is not to be regarded as denying due process of law under the provisions of the Fourteenth Amendment." (Italics supplied.) The police power is an incident of government itself, and the very breath of this inherent power, where delegated to an administrative body, should, in the interest of good government, preclude its exercise in an unbridled and haphazard manner. The gradual sapping of judicial and legislative power by administrative boards, attempting to and exercising arbitrary power serves to undermine the very Constitution itself. There is, of course, a prevailing distinction in cases in which the State has the absolute right to prohibit and those in which the business or profession is considered "legitimate". In the former a summary revocation of a license in the exercise of sound discretion ordinarily is due process; while in the latter notice and hearing are necessary to meet the constitutional standards of due process. Vol. XIV Columbia Law Review, 67, 68, 69. In the instant case relator filed a protest with the commission, and under Rule No. 74 was entitled to a hearing before the commission, as well as a hearing under Rule No. 245, before the announcement of the penalty of suspension imposed by the stewards; and a hearing, where required, imports a full and fair hearing upon sufficient and proper notice. In *Merrit v. Swope*, 46 N. Y. S. (2d) 944, in which the Court set aside the denial of a jockey's license on the ground that the jockey had

not been given a fair hearing, Mr. Justice Untermeyer said: "A 'hearing' must be fair in all respects and not a mere form to precede a predetermined result."

In my opinion, Rule No. 248 provides that the mere presence of drugs in the saliva or urine of a horse creates a conclusive presumption that drugs were administered (1) "for the purpose of stimulating the horse or affecting his speed in a race"; and (2) that the administration was within forty-eight hours of the race; and such presumption serves, as it did in the instant case, to preclude the consideration of evidence on the two salient questions above mentioned. In *Nulter v. State Road Commission of West Virginia,* 119 W. Va. 312, 193 S. E. 549, 194 S. E. 270, this Court, while holding the imperative necessity of the existence of police power, precludes any limitation upon it, it must not be arbitrarily exercised, citing *Hadacheck v. Sebastian,* 239 U. S. 394, 36 S. Ct. 143, 145, 60 L. ed. 348. In that case this Court said that the "Lawful administrative process is due process equally as much as lawful judicial process. Notice and hearing—'a day in court'—are matters of right in judicial proceedings; but not so, necessarily, in administrative proceedings, which from their very character may not require such procedure, or from 'imperative necessity' cannot await it." But in the *Nulter* case, involving the revocation of an automobile license under the Financial Responsibility Act (Acts of the West Virginia Legislature, 1935, Chapter 61, Section 3), the licensee was necessarily afforded a hearing in the rendition of the judgment, upon which the revocation was based, of "a court of competent jurisdiction within the United States * * *." In *Heiner, Collector of Internal Revenue v. Donnan,* 285 U. S. 312, 76 L. ed. 772, 52 S. Ct. 358, the Supreme Court of the United States held unconstitutional *pro tanto* an Act of Congress providing that a gift made within two years of death shall be conclusively presumed to have been made in contemplation of death. In that case the mere showing that a gift was made within two years prior to the death of the donor precluded the

defense that it was not made in contemplation of death. In the instant case the mere presence of a drug in relator's horse, Sunset Boy, made it unnecessary for the commission under the holding of the majority opinion to prove that the drug was administered (1) For the purpose of stimulating the horse or affecting his speed in a race; and (2) that the drug was administered without notice to the track authorities within forty-eight hours prior to the race in which the horse was to be run.

*State ex rel. Paoli v. Baldwin,* 159 Fla. 165, 31 So. (2d) 627, construed a rule of the State Racing Commission of Florida inhibiting the administration by any person or permitting the administration to any horse entered or to be entered in a race of "any stimulant, depressant, hypnotic or narcotic drug, of any kind or description, prior to a race or work-out"; and providing further that "The trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of the acts of a third party." In that case the Florida Court held that mere proof that a drug had been administered to a horse in violation of the rule was "irrebuttable evidence" that the trainer had violated the rule; and a revocation based upon such evidence alone was a denial of due process of law. In *Mahoney v. Byers,* 187 Md. 81, 48 A. (2d) 600, the Court held that a rule of the Maryland Racing Commission, which provided that "The fact that an analysis shows the presence of a drug shall be conclusive evidence either that there was knowledge of the fact on the part of the trainer or he was guilty of carelessness in permitting it to be administered." was a denial of due process. In that case the Maryland Court said: "The Commission, therefore, cannot set up in a rule an irrebuttable presumption and treat it as if it were a prima facie presumption. If this were not so the Commission could justify its action under such rule by simply saying they applied the rule as if it were a prima facie presumption. This it cannot do. It is sufficient to say that the comments of the Chairman of the Commission, made during the course of the hearing before it, and its final order,

show that the irrebuttable presumption set up in the rule was applied in this case." In the *Mahoney* case the Court further said: "The Commission is a creature of the Legislature and the Legislature does not possess the power under the State Constitution to prevent one from making a defense to a charge brought against him by substituting an irrebuttable presumption for facts. Such a law would be arbitrary, illegal, capricious and hence unconstitutional. That the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the People. * * * This rule prevents the trial of facts and calls for the revocation of a license without cause shown." In the instant case the comments of the chairman of the commission made at the hearing, and as disclosed by the record before us, show that the commission applied the irrebuttable presumption rule in the revocation of relator's license.

This Court in writing the majority opinion seems to rely solely upon the case of *Sandstrom v. California Racing Board,* 31 Cal. (2d) 401, 189 P. (2d) 17. This case is cited in the majority opinion as being exactly in point with the instant case. That case involved a rule of the California Racing Board which, like Rule No. 248, was evidently designed to impose strict responsibility upon the trainer for the condition of the horse. The California rule does not provide, as the rules promulgated and framed by the West Virginia Racing Commission that, in order to justify suspension or revocation of a trainer's license, the drugs must be administered (1) For the purpose of stimulating the horse or affecting his speed in a race; and (2) that the administration occurred without notice to the track authorities within forty-eight hours prior to the running of the horse. The *Sandstrom* case clearly is not in point. I do not think that an administrative body, though having almost plenary powers delegated to it by legislative fiat, can, as the West Virginia Racing Commission has done, establish rules governing the revocation of a trainer's license and in actual practice ignore those rules.

But the *Sandstrom* case did not involve the constitutionality of a California statute. As shown by the majority opinion in that case, the Act of the Legislature of California, under scrutiny there, was adopted by the electorate and incorporated in Section 25a, Article IV of the California Constitution. The provisions of the California Act were part and parcel of the California Constitution itself. If such a thing is possible, the California Court was called upon to pass on the constitutionality of its own Constitution. I think the *Sandstrom* case clearly, as above indicated, is not in point with the instant case; and if it were, I agree with the able dissent of Mr. Justice Carter, in which he said: "Certainly there can be no difference in legal effect between absolute liability and a conclusive presumption of liability."

Though I would award the writ for the foregoing reasons, there is a preliminary question which I am taking the liberty to discuss last, which was not considered in the majority opinion, but which, in my opinion, would alone justify the awarding of the writ. As heretofore indicated Rule No. 248 promulgated by the commission, and certainly the commission is bound by its rules, requires that a licensee shall be given a hearing "before any announcement is made of any penalty imposed"; yet the stewards imposed on the relator and her horse, Sunset Boy, the penalty of a six months suspension before any hearing of any kind was had. Moreover, a hearing, in my opinion, presupposes a proper notice of hearing. In re *Securities and Exchange Commission*, 84 F. (2d) 316, (C.C.A. Second Circuit), citing *State ex rel. Hughes v. Milhollon*, 50 N. D. 184, 195 N. W. 292, 295 and *Securities & Exchange Commission v. Torr* (D.C.S.D. N.Y.) 15 F. Supp. 144, it was held that a hearing as distinguished from an investigation "presupposes a formal proceeding upon notice with adversary parties, and with issues on which evidence may be adduced by both parties and in which all have a right to be heard." In the instant case the only notice of hearing which relator had was notice of the ruling of the stewards which reads: "May 2, 1949. Upon receipt of the report

from the chemist employed by the West Virginia Racing Commission that the sample of urine taken from the horse Sunset Boy, winner of the first race on April 23, 1949, showed a *positive reaction*, trainer, Elsie S. Morris, and the horse Sunset Boy are suspended for six (6) months from April 30, 1949. The case is referred to the West Virginia Commission." (Italics supplied.) Such notice, if it may be called a notice, not only preceded the announcement of the penalty imposed by the stewards, contrary to Rule No. 74, but it did not inform the relator (1) what drugs were administered; (2) their nature and effect; (3) whether they were administered for the purpose of stimulating the horse or affecting his speed in the race; and (4) whether they were administered without notice to the track authorities within forty-eight hours prior to the race in which the horse was run. Such belated notice, even if it had been timely, in my opinion, was insufficient in that it did not meet the requirements of a notice which should precede every hearing. How, may I inquire, could relator under such notice have prepared for her defense at the hearing? Evidently the commission gave no proper notice, because, as indicated by this record, the commission erroneously entertained the belief that the foregoing specified matters were not required to be proved as a conclusive presumption arose from the mere showing of the presence of the drugs, which precluded the necessity of further proof. I think for this reason alone, the proceeding before the commission was void, unconstitutional, and was violative of the very rules promulgated by the commission itself. Judge Haymond authorizes me to say that he joins in this dissent.

HAYMOND, PRESIDENT, dissenting:

I concur in the views expressed by Judge Riley in his dissenting opinion, but as I feel that the rule of the commission, No. 248, which the majority sustains, violates the requirements of due process, I file this supplemental dissent.

The majority concedes that the rule constitutes "a harsh" exercise of the police power and that it "admits the imposition of a penalty without fault". In my judgment a rule of that character, even though imposed by the exercise of the police power, should not be given judicial approval. It is not disputed that the evidence fails to show that the relator performed any act in connection with administering the drug, or even knew that it had been given to her horse, until that fact was subsequently determined by the analysis of its urine. The record does not disclose how or by whom the horse was drugged and there is no evidence of the guilt of the relator yet, by the application of the rule, her license is suspended and the horse is disqualified for a period of six months. On the face of this record she is merely an innocent victim and as such she is convicted of the misconduct condemned by the rule and under it she is dealt with and punished as if she were proved guilty of its violation. In its application to the facts and the circumstances of this case, it is not only harsh, as the majority opinion admits, but it is manifestly unfair and unjust. Even the police power of the State should be exercised fairly and justly and not as an instrument of oppression or injustice. As I understand it, due process is designed to guard against and prevent either or both and in my judgment a rule which deprives a person of the defense of innocence of the charge with which he is confronted is not due process but manifest injustice. No governmental authority, judicial, administrative or executive, should convict, or be permitted to convict, any person, whatever may be his character or his calling, in the absence of any proof of his guilt whether the charge against him be a civil wrong or a criminal offense, and no person may be so convicted of such guilt with my consent or approval. It will not do to say that the license of the relator is a privilege, not a right, and that in the exercise of the police power the Legislature may grant or withhold it as it may choose. Conceding all this, the privilege when once granted should not be arbitrarily, unfairly or unjustly withdrawn or revoked without cause based upon

some showing that the licensee is guilty of misconduct which justifies such drastic action. I think injustice has resulted from the application of the challenged rule in the clearly established circumstances of this case and chiefly for that reason I record this dissent.