301 S.E.2d 832

**STATE of West Virginia, ex rel. William B. ASH**

**v.**

**James R. RANDALL, Mayor, City of St. Albans, and Chairman of the Municipal Utility Commission; and L.E. Thompson, Frank Meredith, Dr. A. Bruce McCuskey, and John J. Doub, Members of the Municipal Utility Commission, City of St. Albans.**

Nos. 15522, 15526.

Supreme Court of Appeals of West Virginia.

March 30, 1983.

McHUGH, Justice:

This is a consolidated appeal by both parties from an order entered on December 18, 1981, by the Circuit Court of Kanawha County, West Virginia. That order required the City of St. Albans to reinstate William B. Ash to his former employment with the City's Municipal Utility Commission (hereinafter "Commission"). James R. Randall, et al. appeal from that part of the order. However, the trial court also denied Ash back pay and other benefits he would have accrued had he not been discharged. It is from that part of the order that Ash appeals. We have before us the petitions for appeal, all matters of record and the briefs and argument of counsel.

On September 2, 1977, Ash began employment with the Municipal Utility Commission of the City of St. Albans, West Virginia, as a water plant operator at the City's Water Treatment Plant. On August 25, 1978, he entered Highland Hospital for psychiatric treatment. Ash was discharged from the hospital on September 16, 1978, and was advised by his treating psychiatrist, Dr. Pablo Pauig, that he could resume his employment on September 25, 1978.

After Ash's release from the hospital James R. Randall, the Mayor of St. Albans and Chairman of the Commission, contacted Dr. Pauig. Randall's conversation with Dr. Pauig concerned Ash's ability to responsibly resume his duties as a water plant operator. Randall testified that because Dr. Pauig could offer no assurance that Ash could perform his responsibilities at the Water Treatment Plant, Randall thought it best to get a second opinion concerning Ash's condition. Whereupon, he requested that Ash be evaluated by Dr. Ralph Smith, Jr., a psychiatrist, on October 2, 1978. Ash voluntarily agreed to the evaluation. Dr. Smith's diagnosis of Ash was "[p]robable manic depressive disorder." Dr. Smith also made the following recommendation: "Due to the recurrent nature of this illness which affects his reason and judgment, he would be in a high risk situation in a responsible position where

Daniel F. Hedges, Charleston, for appellee.

Charles M. Surber, Jr., Jackson, Kelly, Holt & O'Farrell, Charleston, for appellants.

the citizens of St. Albans depend for their health on his ability to make good judgments and timely decisions." Upon receiving Dr. Smith's report, and after conferring with Ash's supervisor, Randall terminated Ash's employment on October 13, 1978.

On October 18, 1978, Ash requested to be reinstated to his former position. After his request was denied by Randall, Ash petitioned the Circuit Court of Kanawha County for a writ of mandamus compelling his reinstatement with back pay. Following a nonjury trial, the trial court held that Ash was terminated in contravention of *W.Va. Code*, 27–5–9(a) [1977].[1] In so holding, the trial court issued the writ of mandamus compelling his reinstatement. However, the trial court also held that because mandamus was not the appropriate remedy for lost wages the request for back pay would be denied.

In this action, we are presented with two issues: (1) whether Ash was properly terminated from his employment with respect to *W.Va. Code*, 27–5–9(a) [1977]; and (2) if he was, whether a writ of mandamus will be issued compelling the Commission to pay Ash the wages he would have earned had he not been discharged. The issues will be discussed in the order presented.

*W.Va. Code*, 27–5–9(a) [1977], provides, *inter alia*, that "[n]o person shall be deprived of any civil right solely by reason of his receipt of services for mental illness." Our initial inquiry must therefore focus upon whether Ash was discharged from his employment "solely by reason of his receipt of services for mental illness."[2] The trial court, however, did not make such a determination. Instead, the trial judge held that "[f]or all practical purposes it is obvious from the record that Mr. Ash was removed from his employment because of his mental condition," and that "the evidence is not conclusive that the absence of a mental disease or disorder is essential to the position of water treatment operator." He therefore concluded that the discharge was improper. It is apparent that the basis of the trial court's decision went beyond the provisions of *W.Va. Code*, 27–5–9(a) [1977].

■ We are also of the opinion that even if Ash had been improperly discharged solely because he received services for his mental illness, in addition, he must show under *Hurley v. Allied Chemical Corporation, supra,* that he was "otherwise qualified" for his employment as water plant operator.

It should be noted that with respect to the question of whether Ash was discharged solely by reason of his receipt of services for mental illness, and the related question of whether Ash was otherwise qualified as water plant operator, we recognize a duty on the part of Randall as Mayor of the City of St. Albans and Chairman of the Municipal Utility Commission to consider the health and safety of the public. Attendant to that duty is ensuring that the

1. *W.Va. Code*, 27–5–9(a) [1977] provides:
    No person shall be deprived of any civil right solely by reason of his receipt of services for mental illness, mental retardation or addiction, nor shall the receipt of such services modify or vary any civil right of such person, including, but not limited to, civil service status and appointment, the right to register for and to vote at elections, the right to acquire and to dispose of property, the right to execute instruments or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law, but a person who has been adjudged incompetent pursuant to article eleven of this chapter and who has not been restored to legal competency may be deprived of such rights. Involuntary commitment pursuant to this article shall not of itself relieve the patient of legal capacity.

2. This Court first addressed *W.Va. Code*, 27–5–9(a) [1977] in *Hurley v. Allied Chemical Corporation,* 164 W.Va. 268, 262 S.E.2d 757 (1980). Syllabus point 2 of that case held that, "W.Va. Code, 27–5–9(a), creates an implied private cause of action against a private employer who denies employment to an otherwise qualified individual on the sole basis that such individual has received services for mental illness, mental retardation or addiction." While *Hurley* concerned a prospective employee of a private employer, we did not have occasion to discuss whether a cause of action would also extend to a discharged employee of a public employer. Nonetheless, because the language and purpose of the statute are clear, we apply the principles of *Hurley* to the present case.

individuals who are employed by the city are capable of performing their responsibilities without compromising the health and safety of the public. Randall as Mayor and Chairman of the Commission must be afforded certain latitude when analyzing an individual's capacity to responsibly perform his employment duties.

██ It has been recognized that the health and safety of the public are legitimate and primary concerns of municipal government. 7 McQuillin *Municipal Corporations* § 24.221 (1981). *See also Father Basil's Lodge, Inc. v. City of Chicago*, 393 Ill. 246, 65 N.E.2d 805 (1946). The importance of health and safety as they relate to job dismissals was recognized by this Court in *State ex rel. Perry v. Miller*, 300 S.E.2d 622 (W.Va.1983). In that case we allowed mine foremen to be suspended, albeit temporarily, when that suspension was necessary for health or safety reasons.

██ Pursuant to the provisions of *W.Va. Code*, 27–5–9(a) [1977], when it becomes apparent to an official entrusted with the responsibility of ensuring the health and safety of the public that an employee's mental illness compromises those concerns, it is within that official's general authority to discharge that employee. However, those circumstances do not give rise to an unlimited power to discharge that employee. The official must, under *W.Va.Code*, 27–5–9(a) [1977], establish that the employee was not discharged "solely by reason of his receipt of services for mental illness."

This Court is mindful of the need to protect a person who has a mental illness and who seeks treatment for that illness. However, the rights of the public must also be considered. The record in this case demonstrates that Ash was not discharged solely by reason of receipt of services for mental illness. Rather, his discharge was based upon a determination by Randall that Ash's mental illness inhibited Ash's ability to perform his employment duties, which in turn, affected the health and safety of the citizens of St. Albans.

██ The testimony in the present case reveals that virtually every duty of a water plant operator required Ash to make timely, well reasoned decisions.[3] While the testimony of the two psychiatrists was somewhat conflicting, it can be concluded, however, that Ash's mental illness was of such a character that it could have affected his ability to make those well reasoned judgments.[4] The testimony further reveals that if the duties of a water plant operator

---

**3.** The record indicates that Ash's duties at the Water Treatment Plant included maintaining chemical control machines which are used for coagulation of untreated water. If these machines are not properly operated the water can become turbid, which in turn can produce disease causing organisms called pathogens to enter the water supply. The testimony also indicates that the chemical control machines were unreliable. The unreliability required Ash's constant attention because if a machine failed, or a power outage occurred, an overflow in the water reservoir could result. An overflow could cause severe damage to the plant itself, including the stoppage of all operations for about two days. This could result in unsafe water being pumped into the community. The record reveals two instances of improper operation of the equipment by Ash, the potential hazardous effects of which were aborted by coworkers. Moreover, the testimony reveals that Ash often worked alone at the plant, and Ash himself testified that he left the plant unattended on at least one occasion.

**4.** Dr. Pauig testified that Ash's diagnosis was chronic schizophrenia and that Ash's condition required him to take two tranquilizers. Given these facts Dr. Pauig further testified that while Ash remained on medication Ash should continue to be in "good remission," and therefore could continue his duties as before. However, Dr. Pauig also testified that when he released Ash to return to work, Dr. Pauig did not have a complete understanding of Ash's responsibilities. Dr. Smith testified that Ash's diagnosis was "[p]robable manic depressive disorder," and that Ash had difficulty in distinguishing reality from fantasy. Moreover, Dr. Smith was less optimistic than Dr. Pauig concerning Ash's remission. Dr. Smith also summed up Ash's condition by testifying, "I see no psychiatric impairment that would preclude his working in the capacity he worked in before, that would not require him to be in a situation where he is totally responsible for someone else's safety."

It is obvious that the psychiatrists arrived at different conclusions concerning Ash's ability as it related to his employment as a water plant operator. Randall was given a difficult choice but he had the authority under the circumstances of this case to make the decision as to Ash's continued employment as an operator.

are not performed in a timely and responsible manner the quality and safety of the St. Albans water supply would be substantially affected.[5]

The New York Court of Appeals was presented with a similar issue in *McQueen v. New York City Transit Authority*, 34 N.Y.2d 343, 357 N.Y.S.2d 482, 313 N.E.2d 779 (1974). In that case the Transit Police Department of The New York City Transit Authority sought to discharge a patrolman due to his "mental instability." The New York Court held that in the interest of public safety the employee could be discharged if it was shown that his mental condition interfered with his competence in performing his employment duties.

Upon all of the above we are of the opinion that where an employee has been discharged from employment in violation of the provisions of *W.Va.Code*, 27–5–9(a) [1977], "solely by reason of his receipt of services for mental illness," that employee in contesting the discharge must nevertheless establish under *Hurley v. Allied Chemical Corporation, supra,* that he or she is "otherwise qualified" for that employment, which means that the mental illness would not impair his or her ability to perform the duties of that employment.

■ As the above described testimony indicates, Ash failed to demonstrate that he was "otherwise qualified" to perform the duties of water plant operator. Therefore, the discharge of Ash was proper and the circuit court erred in reinstating Ash to his position.

■ In syllabus point 1 of *Point Pleasant Register Publishing Company v. County Court of Mason County,* 115

W.Va. 708, 177 S.E. 873 (1934), it was held: "The judgment of a circuit court in a proceeding in mandamus based upon a finding of fact upon conflicting testimony will not be reversed unless it appears to be clearly wrong."

Upon review of the record in this case, we conclude that the trial judge was clearly wrong in holding that Ash was able to perform his employment, contrary to Randall's authority in matters of health and safety. In so holding we are mindful that the trial judge did not have at his disposal the standard relating to health and safety which we now apply when reviewing a municipal employee's claim of discharge in violation of *W.Va.Code*, 27–5–9(a) [1977].

Based upon the testimony in the record, we do not deem it necessary to remand this case for further factual development. We conclude as a matter of law that Ash was properly discharged by Randall by reason of Ash's mental condition.

Accordingly, for the foregoing reasons, we hold that Ash was not discharged from his employment "solely by reason of his receipt of services for mental illness," and therefore reverse the part of the trial court's order which required the City of St. Albans to reinstate Ash as a water plant operator.[6] Because we hold that Ash's discharge was proper, we need not rule upon, nor discuss, the second issue of whether a writ of mandamus will lie compelling the city to compensate Ash for back pay.

Reversed.

---

5. This Court also takes judicial notice of the Public Water Supply Regulations promulgated by the West Virginia Department of Health which became effective April 8, 1978, and which were in force when Ash's employment was terminated. The regulations thoroughly cover all aspects of public water supply systems. Moreover, the regulations have the force and effect of law. *See generally State ex rel. Barker v. Manchin*, 167 W.Va. 155, 279 S.E.2d 622 (1981); *Mountaineer Disposal Service, Inc. v. Dyer*, 156 W.Va. 766, 197 S.E.2d 111 (1973); *State ex rel. Morris v. West Virginia Racing Commission*, 133 W.Va. 179, 55 S.E.2d 263 (1949). The regulations in effect when Ash was discharged have

been superseded by the current Public Water Supply Regulations which went into effect April 2, 1982.

6. Randall asserts that, inasmuch as Ash was not subject to involuntary commitment under *W.Va. Code*, ch. 27, art. 5, Ash is not entitled to relief under the provisions of *W.Va.Code*, 27–5–9(a) [1977]. The *Hurley* decision, however, and *W.Va.Code*, 27–5–9(a) [1977], imply that the prohibition against discharge solely for receipt of mental health services applies beyond the provisions of *W.Va.Code*, ch. 27, art. 5, which *is* entitled "Involuntary Hospitalization."