727 S.E.2d 799

**PNGI CHARLES TOWN GAMING, LLC
d/b/a Charles Town Races and
Slots, Petitioner**

v.

**Lawrence REYNOLDS, Anthony Mawing,
Alexis Rios–Conde, Jesus Sanchez, Dale
Whitaker, Luis Perez, and Tony Mar-
agh, Plaintiffs Below, Respondents**

and

**West Virginia Racing Commission,
Defendant Below, Respondent.**

No. 101503.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 20, 2011.

Decided Nov. 18, 2011.

Carte P. Goodwin, Esq., Goodwin & Goodwin, Charleston, WV and Stuart A. McMillan, Esq., Brian M. Peterson, Bowles Rice McDavid Graf & Love, LLP, Charleston, WV, for the Petitioner.

Michael L. Glasser, Esq., Meyer Ford Glasser & Radman, PLLC, Charleston, WV, and Mindy L. Coleman, PHV, Nicholasville, KY, for Amicus Curiae Jockeys' Guild, Inc.

Gregory A. Bailey, Esq., Arnold & Bailey, PLLC, Shepherdstown, WV, and Douglas L. McSwain, PHV, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY, for Amicus Curiae NHBPA, CTHBPA, & MPHBPA.

Benjamin L. Bailey, Esq., Christopher S. Morris, Esq., Bailey & Glasser, LLP, Charleston, WV, for the Respondent Jockeys.

Darrell V. McGraw, Jr., Esq., Attorney General, Kelli D. Talbott, Esq., Deputy Attorney General, Anthony E. Eates, Esq., Assistant Attorney General, for the West Virginia Racing Commission.

WORKMAN, C.J.:

The Petitioner, PNGI Charles Town Gaming, LLC, d/b/a Charles Town Races & Slots (hereinafter "CTR & S"), a non-party in the underlying action,[1] appeals the circuit court's Order enjoining it from excluding certain jockeys [2] from CTR & S's premises pending the outcome of the jockey's administrative appeal of the West Virginia Racing Commission's (hereinafter "Racing Commission") decision [3] to the circuit court. The Racing Commission suspended each jockey's occupational permit for thirty days and imposed fines. CTR & S argues that the circuit court erred: 1) in entering a stay of the Racing Commission's order even though West Virginia Code § 19–23–17 (2007) expressly prohibits such a stay; 2) in exercising jurisdiction over CTR & S, a non-party, by concluding that CTR & S was "in active concert or participation with" the Racing Commission under Rule 65(d) of the West Virginia Rules of Civil Procedure; 3) in enjoining CTR & S by abusing its discretion in applying the four factor test set forth by the Court for the issuance of injunctions in *Camden–Clark Memorial Hospital Corp. v. Turner*, 212 W.Va. 752, 575 S.E.2d 362 (2002); 4) in failing to follow the procedural requirements set forth in West Virginia Rule of Civil Procedure 65 prior to issuing the injunction in this case;

---

1. The circuit court's Order at issue grants injunctive relief barring CTR & S, a non party, from excluding the Respondents during the Respondents' appeal. The Court has previously found that a non party has standing to pursue an appeal in *State v. Brandon B.*, 218 W.Va. 324, 328, 624 S.E.2d 761, 765 (2005)("Ultimately, 'the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' *State ex rel. Abraham Linc Corp. v. Bedell*, 216 W.Va. 99, 111–12, 602 S.E.2d 542, 554–55 (2004) (internal citations omitted) (Davis, J., concurring)."). Because CTR & S is entitled to have the Court decide whether a common law right to eject the Respondents exists, it has standing to pursue the instant appeal.

2. The jockeys are the Plaintiffs below and include Lawrence Reynolds, Anthony Mawing, Alexis Rios–Conde, Jesus Sanchez, Dale Whittaker, Luis Perez, and Tony Maragh. For purposes of this appeal, these individuals will be referred throughout collectively as "the jockeys."

3. The West Virginia Racing Commission is the Defendant below.

and 5) by issuing an injunction that infringes upon CTR & S's fundamental common law property right to exclude permit holders, including jockeys, from its premises so long as the exclusion is not based upon race, creed, national origin, or other protected classification. Based upon a review of the respective parties' briefs and oral arguments, the amici curiae briefs,[4] the record, and all other matters submitted before the Court, the Court affirms the circuit court's decision.

### I. Procedural and Factual History

On March 25 and 26, 2009,[5] each of the seven named jockeys allegedly failed to declare to Michael Garrison, the Clerk of Scales,[6] that each jockey was overweight in excess of one pound, or if the jockey did declare an overweight amount, the jockey failed to declare an accurate amount and/or the jockey failed to declare to the clerk of scales that the jockey was overweight in excess of two pounds. *See* W. Va.C.S.R. §§ 178–1–17.2 and 178–1–63.3 (respectively providing that any overweight amount in excess of one pound shall be declared by the jockey to the clerk of scales at least one hour before the appointed race and that an overweight amount of more than two pounds in excess of the weight the horse is to carry shall be declared to the clerk of scales). The jockeys and the clerk of scales allegedly were caught on videotape not properly completing the weigh outs.[7]

On April 8, 2009, the board of stewards [8] concluded that the jockeys had violated certain provisions of the West Virginia Code of State Rules including failure to declare an overweight amount.[9] The board of stewards imposed a $1,000 fine on each of the jockeys and a thirty-day suspension of each of the jockey's occupation permits.

By letter dated April 14, 2009,[10] from CTR & S to Lawrence Reynolds, one of the jockeys involved in the instant matter, CTR & S notified Mr. Reynolds that it was ejecting him from its property "effective immediately." According to the letter, "[a]ny authorization, license or invitation to enter upon the property, now or in the future is hereby revoked."

Also on April 14, 2009, Mr. Reynolds filed a "Verified Complaint for a Temporary Restraining Order,[11] Injunctive Relief and Damages" in the Circuit Court of Kanawha County, West Virginia. According to allegations

---

**4.** Two briefs were submitted on behalf of the following amici curiae: Jockeys' Guild, Inc., and The National HBPA, Inc.; Charles Town Horsemen's Benevolent & Protective Association, and Mountaineer Park Horsemen's Benevolent & Protective Association.

**5.** Some of the factual allegations are taken from the West Virginia Racing Commission's Findings of Fact, Conclusions of Law, and Recommended Order entered on April 22, 2010. This Order is part of the record before the Court, however, it is currently on appeal to the Circuit Court of Kanawha County, West Virginia, and is not the subject of the instant appeal. Because the underlying charges are not currently before the Court, the Court is not making any decision relative to the factual allegations.

**6.** The clerk of scales is not a party to these proceedings, but he was also fined and his occupational permit was indefinitely suspended. Further, he was a CTR & S employee and was terminated from his employment with CTR & S.

**7.** A "weigh out" refers to the jockey stepping onto a scale in the presence of the clerk of scales prior to a race to ensure that the jockey's weight matches the weight assigned to the horse that the jockey is schedule to ride. *See* W. Va.C.S.R. § 178–1–2.112 and § 178–1–63.1. According to

West Virginia Code of State Rules and Regulations § 178–1–63.2, "[n]o jockey may carry overweight in excess of two (2) pounds without permission of the owner or trainer, and under no circumstances, shall the overweight exceed seven (7) pounds." *Id.*

**8.** The stewards are the racing officials at the racetrack that "are strictly responsible to the [West Virginia] Racing Commission for the conduct of all meetings in every detail ... pertaining to the racing law and rules of the Racing Commission." W. Va.C.S.R. § 178–1–10.2.

**9.** The board of stewards also found that the jockeys had violated West Virginia Code of State Rules § 178–1–60.1, relating to dishonest or corrupt practices, § 178–1–60.5, relating to conspiracy, § 178–1–60.16, relating to improper, obnoxious, unbecoming or detrimental conduct.

**10.** The letter was sent to Mr. Reynolds by certified mail on April 14, 2009.

**11.** Even though the circuit court's Order entered April 16, 2009, calls the relief sought a "TRO," it is more appropriately referred to under West Virginia Rule of Civil Procedure 65(b) as a preliminary injunction.

in the complaint, Mr. Reynolds sought an injunction against the Racing Commission to stay the suspension of his racing permit until such time as the jockey received a proper notice and a hearing on the matter leading to the suspension directed by the board of stewards.

Two days after the complaint was filed, on April 16, 2009, the circuit court heard oral argument from counsel for the jockeys and the Racing Commission regarding the injunction and stay sought by Mr. Reynolds. Thereafter, the circuit court entered an injunction and stayed the sanctions imposed against the jockeys until the conclusion of a hearing [12] before the Racing Commission.[13]

After this ruling by the circuit court, CTR & S took the position that it was not barred by the circuit court's Order from excluding the jockeys from its facility pursuant to its asserted common law authority to exclude patrons from its private property. *See, e.g., Marrone v. Washington Jockey Club*, 227 U.S. 633, 33 S.Ct. 401, 57 L.Ed. 679 (1913). Based upon CTR & S's position, on April 16, 2009, the jockeys asked the circuit court to extend the injunction and the stay to include CTR & S. CTR & S was notified of this motion and participated in the hearing on the motion before the circuit court. The circuit court, by Order entered April 16, 2009, found that CTR & S "is in active concert or participation with the Defendant [Racing Commission]" and that "if the Track bars the Plaintiffs from racing at the Track, the irreparable harm that caused the Court to issue the TRO would go unabated. Such conduct would render the Court's TRO a nullity and frustrate the Court's authority to ensure compliance with its lawful orders." The circuit court further stated:

> Therefore, the Court ORDERS that PNGI Charles Town Gaming LLC shall

not restrict or impede the rights of the Plaintiffs listed above to enter the Track and engage in their legitimate racing activities. The suspensions of the Plaintiffs' racing permits are stayed, and until the TRO expires, the Track may not impair or impede the Plaintiffs' rights to engage in activities consistent with the Plaintiffs' racing permits.

The Order was to expire "upon conclusion of the *de novo* hearing before the West Virginia Racing Commission, which will occur within thirty days of the filing of the Request for Hearing, unless extended for good cause shown or by agreement of the parties." There are no objections by CTR & S noted in this Order, nor did CTR & S appeal the rulings in the Order.

The administrative de novo hearing before the Racing Commission hearing examiner occurred over five days in August and September of 2009. In the recommended decision of hearing examiner, dated April 22, 2010, the hearing examiner found that the jockeys were guilty of "conniving" with the Clerk of Scales "in the commission of a corrupt ... practice" by engaging in "farcical" weigh outs. This decision was adopted by the Racing Commission on May 21, 2010, to take effect on June 1, 2010. The Racing Commission suspended each jockey's occupation permit for thirty days and imposed the maximum fine of $1,000 each. The Racing Commission initially orally agreed to stay its final order pending appeal. By Order issued on May 24, 2010, the Racing Commission retracted its oral grant of the jockeys' motion to stay, finding that West Virginia Code § 19–23–17 precluded the Racing Commission from granting a stay.

Also on May 24, 2010, CTR & S filed a "Motion to Confirm Expiration of Temporary

---

12. According to the language in the Order, it was in effect until "the conclusion of the *de novo* hearing." Pursuant to West Virginia Code § 19–23–16(e) (2007):

> All of the pertinent provisions of article five [§§ 29A–5–1 et seq.], chapter twenty-nine-a of this code shall apply to and govern the hearing and the administrative procedures in connection with and following such hearing, with like effect as if the provisions of said article five were set forth in this subsection.

W. Va.Code § 19–23–16(e); *see* W. Va.C.S.R. § 178–1–68.1 to –68.6 (setting forth regulations governing the appeal and review of a board of stewards suspension of an occupational permit).

13. Pursuant to a motion by Mr. Reynolds to consolidate his action with the actions filed by the other jockeys named in this appeal, an Agreed Order to Consolidate was also entered by the circuit court on April 16, 2009.

Restraining Order" wherein the racetrack sought to have the circuit court rule that the preliminary injunction was no longer in effect and that it could exclude the jockeys from its premises. On June 1, 2010, the jockeys filed a petition for review in the circuit court of the administrative proceedings in the same civil action already existing regarding the injunction. *See* W. Va.Code § 19–23–17 ("Any person adversely affected by a decision of the Racing Commission rendered after a hearing held in accordance with the provisions of section sixteen [§ 19–23–16]of this article shall be entitled to judicial review thereof."). The jockeys also filed a motion for an emergency stay with the circuit court. The Racing Commission filed its response opposing the motion the same day. The circuit court granted a temporary stay and set a hearing for June 3, 2010.

On June 3, the circuit court heard arguments [14] regarding whether a stay should be issued and whether CTR & S should be enjoined from preventing the jockeys from racing at CTR & S's racetrack. By Order entered June 3, 2010, the circuit court found

> that the Track's proposed bar of the Petitioners [jockeys] would result in irreparable harm to the Petitioners and would deprive them of a meaningful opportunity for review of the sanctions imposed on the Petitioners by the Racing Commission. The Court further incorporates by reference the findings and rulings of its April 16, 2009, Order which previously granted injunctive relief to the Petitioners and against the Track on the same grounds as those presented here.

The Court further ordered that CTR & S "shall not restrict or impede the rights of the Petitioners to enter the Track and engage in their legitimate racing activities." It is from

**14.** There is no transcript of the June 3, 2010, hearing in the record.

**15.** For reasons set forth in greater detail in Section III.B. *infra*, most of the issues regarding the circuit court's entry of an Order enjoining CTR & S from ejecting the stewards and staying the action of both the Racing Commission and CTR & S until the underlying disciplinary proceeding was complete have been waived. The Court, however, addresses the issue of whether CTR & S has a common law right to eject the jockeys

this Order that the present appeal is brought.

## II. Standard of Review

◼◼◼ Our standard for reviewing the correctness of preliminary injunctions is as follows:

> " 'In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp.*, 168 W.Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law *de novo.*' Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996)." Syl. pt. 1, *State v. Imperial Marketing*, 196 W.Va. 346, 472 S.E.2d 792 (1996).

Syl. Pt. 1, *Camden–Clark Mem'l Hosp. Corp. v. Turner*, 212 W.Va. 752, 575 S.E.2d 362 (2002). Moreover, interlocutory orders issuing preliminary injunctions are subject to immediate appellate review. *See State ex rel. McGraw v. Telecheck Servs., Inc.*, 213 W.Va. 438, 445–47, 582 S.E.2d 885, 892–94 (2003). Applying these principles, the Court reviews the alleged errors raised by CTR & S.

## III. Argument

### A. Right to Eject a Permit Holder

◼◼◼ The crux of the instant appeal is whether a West Virginia horse racetrack has an unrestricted common law right to eject a jockey from its premises.[15] CTR & S argues

because it is purely a question of law that needs resolution. As the Court previously has stated:

> In the concurring opinion of Justice Cleckley in *State v. Greene*, the following observations were made regarding this Court's authority to address an issue that was not properly preserved at the trial court level:
> [A]lthough the rule requiring all appellate issues be [properly] raised first in the circuit court is important, it is not immutable: Our cases have made clear that the failure to

that as a private company that owns a race-track at Charles Town, West Virginia, and as a property owner, it has the common law right to exclude undesirable persons from its premises. CTR & S contends that this common law right is controlling and unaffected by the actions of the West Virginia Legislature. *See* W. Va.Code §§ 19–23–1 to –30 (2007 & Supp.2011) [16] (statutory scheme governing "Horse & Dog Racing"); W. Va. C.S.R. §§ 178–1–1 to –74.3 (legislative rule regarding "Thoroughbred Racing").[17]

In contrast, the Racing Commission maintains that CTR & S's ability to eject a jockey is subject to the plenary authority of the Racing Commission as set forth in West Virginia Code § 19–23–6. Further, the ejection of the jockeys by CTR & S is subject to a review by the Racing Commission under West Virginia Code of State Rules § 178–1–4.7, which gives the ejected jockeys the right of appeal to the Racing Commission. Consequently, the Racing Commission argues that CTR & S does not have an unfettered common law right to eject a jockey regardless of any actions taken by the Racing Commission. Lastly, the jockeys argue that CTR & S's appeal was untimely filed and premised upon issues that CTR & S waived below.

▬ The ability of CTR & S to conduct horse racing at its Charles Town racetrack is derived from a grant of authority by the West Virginia Legislature that allows horse racing to take place in this State. As provided in West Virginia Code § 19–23–1(a):

No association [18] shall hold or conduct any horse or dog race meeting at which horse or dog racing is permitted for any purse unless such association possesses a license therefor from the West Virginia Racing Commission and complies with the provisions of this article and all reasonable rules and regulations of such Racing Commission.

*Id.* (Footnote added). As the Court acknowledged in *State ex rel. Morris v. West Virginia Racing Commission,* 133 W.Va. 179, 55 S.E.2d 263 (1949):

There cannot, in our opinion, be any doubt as to the power of the Legislature to regulate horse racing, nor does there seem to be any contention on that point. Whatever may be said in favor of horse racing, and much can be said, it must be admitted that great evil attends its practice, such as calls for the intervention of the State, under its police power, to the end that such evil be minimized so far as it is possible to do so. This intervention and control is exercised under the police power of the State, and the use of that power rests with the Legislature. The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, or natural right which, in effect, is unlimited.

*Id.* at 192, 55 S.E.2d at 270. Likewise, the United States District Court for the Southern District of West Virginia in *Hubel v. West Virginia Racing Commission,* 376 F.Supp. 1 (S.D.W.Va.), *aff'd,* 513 F.2d 240 (4th Cir.1975), stated that

[t]he power of the legislature to regulate or even abolish horse racing is, of course, well established. *See Harbour v. Colorado State Racing Commission,* 32 Colo.App. 1,

---

[properly] raise issues below is not a jurisdictional prerequisite to an appeal but, rather, is a gatekeeper provision rooted in the concept of judicial economy, fairness, expediency, respect, and practical wisdom. Requiring issues to be [properly] raised at the trial level is a juridical tool, embodying appellate respect for the circuit court's advantage and capability to adjudicate the rights of our citizens.

*Louk v. Cormier,* 218 W.Va. 81, 86, 622 S.E.2d 788, 793 (2005) (*quoting State v. Greene,* 196 W.Va. 500, 505–06, 473 S.E.2d 921, 926–27 (1996) (Cleckley, J., concurring)).

**16.** Two of the statutes, West Virginia Code §§ 19–23–3 and 19–23–6, were amended by the Legislature in 2011; however, the changes were minor and do not impact the decision in this case. For purposes of this opinion, the Court uses the pre–2011 statutes as the 2011 changes were not in effect at the time of the lower court's order that is being appealed.

**17.** The Thoroughbred Racing Rule that governs this case was effective April 6, 2007.

**18.** "Racing association" or "person" is defined as "any individual, partnership, firm, association, corporation or other entity or organization of whatever character or description[.]" W. Va. Code § 19–23–3(7).

505 P.2d 22 (1973); *Tweel v. West Virginia Racing Commission,* 138 W.Va. 531, 76 S.E.2d 874 (1953); *State ex rel. Morris v. West Virginia Racing Commission,* 133 W.Va. 179, 55 S.E.2d 263 (1949). The exercise of the state's police power in this area of endeavor is to minimize the potential evil that attends the practice of horse racing. *See Sandstrom v. California Horse Racing Board,* 31 Cal.2d 401, 189 P.2d 17 (1948). It is apparent, therefore, that the state has the inherent authority to require trainers and others associated with horse racing to be licensed and otherwise regulated by the state.

376 F.Supp. at 4.

Horsing racing, therefore, cannot occur in this State unless the association conducting it has been licensed by the Racing Commission. *See* W. Va.Code § 19–23–1. Further, permits issued by the Racing Commission are required for certain individuals, including jockeys, before they can engage in their trade at a licensed racetrack. *See* W. Va. Code § 19–23–2.[19] While some people who hold permits are employees of the racetrack, it is significant that the jockeys in the instant case are independent contractors, not racetrack employees.[20]

Additionally, the Legislature has placed with the Racing Commission, "full jurisdiction over and shall supervise all horse racing meetings,[21] all dog racing meetings and all persons involved in the holding or conducting of horse or dog racing meetings and, in this regard, it has plenary power and authority. . . ." W. Va.Code § 19–23–6. (Footnote added). Further, West Virginia Code § 19–23–6(8) specifically provides that the Racing Commission has the power

[t]o investigate alleged violations of the provisions of this article, its reasonable rules and regulations, orders and final decisions and to take appropriate disciplinary action against any licensee or permit holder or construction permit holder for the violation thereof or institute appropriate legal action for the enforcement thereof or take such disciplinary action and institute such legal action[.]

*Id.*

■ Incorporated into the legislative scheme regulating horse racing is a recognition by the Legislature that an association can eject a person from its grounds. Specifically, West Virginia Code of State Rules and Regulations § 178–1–4.7 provides:

Any person ejected by the stewards or the association from the grounds of an association shall be denied admission to the grounds until permission for his or her reentry has been obtained from the association and the Racing Commission. *How-*

---

**19.** West Virginia Code § 19–23–2(a) requires that the following persons obtain a permit from the Racing Commission before participating in horse or dog racing at a licensed race track:

No person not required to be licensed under the provisions of section one [§ 19–23–1] of this article shall participate in or have anything to do with horse or dog racing for a purse or a horse or dog race meeting at any licensee's horse or dog racetrack, place or enclosure, where the pari-mutuel system of wagering upon the results of such horse or dog racing is permitted or conducted, as a horse owner, dog owner, jockey, apprentice jockey, exercise boy, kennel keeper, trainer, groom, plater, stable foreman, valet, veterinarian, agent, clerk of the scales, starter, assistant starter, timer, judge or pari-mutuel employee, or in any other capacity specified in reasonable rules and regulations of the Racing Commission unless such person possesses a permit therefor from the West Virginia Racing Commission and complies with the provisions of this article and all reasonable rules and regulations of such Racing Commission.

W. Va.Code § 19–23–2(a).

**20.** The importance of the jockeys status as independent contractors is that CTR & S argued that the Racing Commission could order the re-hire and allow re-entry of a terminated racetrack employee who holds a permit if the Racing Commission decided that the racetrack's actions were unwarranted. The Racing Commission, however, represents to the Court that the termination of a track employee is only of concern to the Racing Commission insofar as the racetrack has the obligation to report violations to the Racing Commission so that action can be taken against the state-issued permit. According to the Racing Commission, it "does not wish to use and has never used its review right under § 4.7[ ] to do anything other than provide a check and balance on the track's ejectment of permit holders who are not employees of the racetrack."

**21.** "Horse racing meeting" is defined as "the whole period of time for which a license is required by the provisions of section one [§ 19–23–1] of this article." W. Va.Code § 19–23–3(4).

*ever, all occupation permit holders who are ejected have the right of appeal to the Racing Commission.* *Id.*[22] (Emphasis added). The concept of allowing a licensed racing association like CTR & S to eject a person from its grounds undoubtedly arises from the common law. The United States Supreme Court in *Marrone v. Washington Jockey Club*, 227 U.S. 633, 33 S.Ct. 401, 57 L.Ed. 679 (1913), first recognized the common law right of a racetrack to exclude a patron by holding that such exclusions by racetracks under the common law were not actionable. *See James v. Churchill Downs, Inc.*, 620 S.W.2d 323, 324 (Ky.Ct.App.1981); *Garifine v. Monmouth Park Jockey Club*, 29 N.J. 47, 148 A.2d 1, 5 (1959), *superceded by statute as stated in Uston v. Resorts Intern. Hotel, Inc.*, 89 N.J. 163, 445 A.2d 370 (1982); *see also* Bennett Liebman, *The Supreme Court and Exclusions by Racetracks*, 17 Vill. Sports & Ent. L.J. 421 (2010)(recognizing that "[i]n 1913, the United States Supreme Court in *Marrone v. Washington Jockey Club*, through a decision authored by Justice Oliver Wendell Holmes, established this principle of total management discretion in racetrack exclusions."). It is important to note that the issue before the Court does not concern an exclusion of a mere patron from a racetrack.[23]

■ The express language of West Virginia Code of State Rules and Regulations § 178–1–4.7 makes clear that a racing association's right to eject a person from its grounds is not an unfettered right as argued by CTR & S. To the contrary, the regulation which permits a racing association to eject a person contains the following restrictive language: *"However, all occupation permit holders who are ejected have the right of appeal*[24] *to the Racing Commission."* W.

**22.** A new Thoroughbred Racing Rule went into effect on July 10, 2011. The language contained in West Virginia Code of State Rules § 178–1–4.7 remains the same in the new rule; however, in the current rule it is located at West Virginia Code of State Rules § 178–1–6.1.

**23.** Other jurisdictions have extended this common law right of racetracks to exclude patrons to allow racetracks to exclude permit holders such as jockeys. For instance, in *Calder Race Course, Inc. v. Gaitan*, 393 So.2d 15 (Fla.Dist.Ct.App. 1980), the Florida court found that despite the State of Florida's regulation and control of pari mutuel wagering in racing establishments, that action "standing alone, does not make those commercial enterprises amenable to regulation by the court" and "[u]ntil the Florida Legislature acts or private racing establishments disparage constitutionally guaranteed rights, they continue to have the right to choose those persons with whom they wish to do business." *Id.* at 16; *see Bresnik v. Beulah Park Ltd. P'ship*, 67 Ohio St.3d 302, 617 N.E.2d 1096, 1098 (1993)(determining that "Beulah Park possesses the common-law right to exclude whomsoever it pleases, provided the General Assembly has not abolished that right."); *Martin v. Monmouth Park Jockey Club*, 145 F.Supp. 439, 440 (D.N.J.1956), *aff'd*, 242 F.2d 344 (3d Cir.1957)("Although it is intensely regulated, the defendant Club is a private organization. Nothing is more elementary than its right as a private corporation to admit or exclude any persons it pleases from its private property, absent some definite legal compulsion to the contrary."). Contrariwise, there is legal authority from other jurisdictions that have rejected a racetrack's right to unilaterally eject racing permit holders without consequence. *See Cox v. Nat'l Jockey Club*, 25 Ill.App.3d 160, 323 N.E.2d 104, 108 (1974)("We ... are of the opinion that with the benefit of receiving a quasi-monopoly comes corresponding obligations one of which is not to arbitrarily exclude a jockey who desires to participate in a racing meet. The arbitrary exclusion of the plaintiff meant that he was deprived of the opportunity to engage in his chosen occupation within a reasonable geographic area and for a significant period of time."); *Jacobson v. N.Y. Racing Assoc.*, 33 N.Y.2d 144, 350 N.Y.S.2d 639, 305 N.E.2d 765, 768 (1973)(racetrack may not with impunity exclude a state-license racing participant as such action "may infringe on the State's power to license horsemen"); *see also* Liebman, *supra* at 458 (stating that "many states have sought to protect licensees in horse racing ... by making changes in the statutes and rules governing the powers of race tracks. A number of states have enacted statutes that require that race tracks have just cause to exclude a licensee from a race track. Others allow excluded licensees an appeal to the state racing commission to contest the exclusion, and some specify the grounds required for any exclusion.")(Footnotes containing citations to statutory authorities omitted).

**24.** CTR & S also argues that because of the definition of an appeal, this restrictive language applies only to an appeal of an ejection by the stewards. The term "appeal" is defined in West Virginia Code of State Rules § 178–1–2.7 as "a request for the Racing Commission or its designee to ... review any decisions or rulings of the stewards." That definition, however, must be read in pari materia with the prefatory language found at the beginning of the definitions section, provides that "[a]s used in this rule and *unless*

Va.C.S.R § 178–1–4.7 (Footnote and emphasis added). This provision emanates from the United States Supreme decision in *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), wherein the Supreme Court determined that there is a property interest in a license or permit issued by a state racing commission, like the permit issued to the jockeys in the instant matter, sufficient to invoke the Due Process Clause. *Id.* at 64, 99 S.Ct. 2642; *see Hubel*, 376 F.Supp. at 4 ("Once a license has been awarded a horse trainer, however, it cannot be suspended or revoked without affording the trainer due process of law. *Brennan v. Illinois Racing Board*, 42 Ill.2d 352, 247 N.E.2d 881 (1969)."). Consequently, under the express language of the State rule,[25] if a racing association ejects a permit holder that permit holder is entitled to appeal the ejection to the Racing Commission. W. Va.C.S.R § 178–1–4.7.

■ In providing for an administrative review of the decision to eject, the Legislature has placed the ultimate decision, subject to judicial review, of whether the permit holder should be ejected with the Racing Commission. Pursuant to the West Virginia Constitution, Article VIII, Section 13,

> [e]xcept as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature.

*Id.* As the Court previously held, "[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law." Syl. Pt. 2, *Smith v. W. Va. State Bd. of Educ.*, 170 W.Va. 593, 295 S.E.2d 680 (1982); *see also Morningstar v. Black and Decker Mfg. Co.*, 162 W.Va. 857, 874, 253 S.E.2d 666, 675 (1979) (stating that "the legislature may alter or amend the common law[.]").

■ It logically follows that the consequence of the Legislature providing a permit holder the right to appeal an ejection to the Racing Commission is that if the Racing Commission disagrees with the ejection and either reverses it or provides for some lesser punishment, such as a thirty-day suspension, then the racing association must abide by the Racing Commission's decision. To allow a racing association, such as CTR & S, to eject a permit holder, such as the jockeys in the instant case, notwithstanding any measures taken by the Racing Commission upon an appeal of the permit holder would render the Legislative rule meaningless. In other words, if the Legislature intended for a racing association to have an unfettered right to eject the permit holder there would have been no reason for the Legislature to add the language "[h]owever, all occupation permit holders who are ejected have the right of appeal to the Racing Commission[.]" W. Va. C.S.R § 178–1–4.7. Thus, by providing the permit holder with a right to appeal an ejection, the Legislature necessarily conditions the racing association's ability to eject a permit holder on a review by the Racing Commission.[26]

Accordingly, based upon the foregoing, the Court holds that an ejection of a permit

---

the context clearly requires a different meaning, the following terms shall have the meaning ascribed in this section." W. Va.C.S.R. § 178–1–2 (Emphasis added). In the context of West Virginia Code of State Rules and Regulations § 178–1–4.7, the meaning of an appeal necessarily has been expanded to include an appeal of ejection by the stewards or by an association as well. *Id.*

**25.** A fundamental principle of statutory construction is that

> "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus

Point 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).

Syl. Pt. 2, *State ex rel. Miller v. Stone*, 216 W.Va. 379, 607 S.E.2d 485 (2004). There is no alleged error concerning the pertinent rule being ambiguous.

**26.** It is understandable that a racetrack would want to eject a permit holder for conduct that is alleged to be fraudulent or corrupt. However, the Legislature has expressly placed plenary power and authority concerning such alleged conduct involving permit holders with the Racing Commission. *See* W. Va.Code § 19–23–6 and W. Va.C.S.R. § 178–1–4.7.

holder by either a racing association or the stewards is subject to review by the West Virginia Racing Commission as set forth in West Virginia Code § 19–23–6 (2007 & Supp. 2011) and West Virginia Code of State Rules § 178–1–4.7.

In the instant case, CTR & S's basis for ejecting the jockeys was grounded in alleged misconduct by the jockeys, including failure to declare overweight amounts during weigh outs before horse races. CTR & S's decision to eject came several days after the board of stewards imposed a thirty-day suspension and fine. On April 16, 2009, the jockeys filed for injunctive relief in circuit court to stay the suspension of the racing permit until such time as the jockeys received a proper notice and a hearing on the matter leading to the suspension directed by the board of stewards. By Order on the same day, the circuit court extended the injunction and stay to preclude CTR & S's ejection of the jockeys pending resolution of their administrative appeal. According to West Virginia Code of State Rules and Regulations, the jockeys, as permit holders, had the right to appeal the ejection and CTR & S is bound by the Racing Commission's decision, subject to judicial review.

### B. Issues Regarding Issuance of Injunction and Stay

CTR & S makes several other assignments of error regarding the circuit court's issuance of an injunction and stay of the imposition of sanctions by the Racing Commission.[27] The circuit court found by Order entered April 16, 2009, that CTR & S was bound by the circuit court's injunction and stay issued between the jockeys and the Racing Commission. At the time the injunction was originally entered on April 16, 2009, CTR & S noted no objections to the Order on its face, nor did CTR & S appeal the original Order. Instead, CTR & S acted in accordance with the circuit court's April 16, 2009, Order for thirteen months. Then, after the underlying administrative action against the jockeys had concluded and the jockeys had invoked their rights to appeal the administrative decision to the circuit court, CTR & S, on May 24, 2010, filed a "Motion to Confirm Expiration of Temporary Restraining Order." In this motion, CTR & S sought

> an order confirming the expiration[28] of the Temporary Restraining Order entered April 16, 2009, against Charles Town Races and Slots. The TRO has expired by its terms, and should not be extended because it interferes with CTR & S's common law right to exclude undesirable persons from its property—a right existing independent of any licensing decision made by the Racing Commission.

(Footnoted added).

CTR & S argues that it did not waive its objections to the injunction because it objected to the later June 3, 2010, Order and, therefore, preserved its rights. It appears from CTR & S's motion submitted to the circuit court in May of 2010 that CTR & S

---

**27.** CTR & S argues that: 1) the circuit court lacked discretion to enter a stay of the Racing Commission's order under the provisions of West Virginia Code § 19–23–17; 2) the circuit court erred in concluding that CTR & S was "in active concert or participation with" the Racing Commission under the provisions of West Virginia Rule of Civil Procedure 65(d) by excluding the jockeys from racing at CTR & S's property; 3) the circuit court abused its discretion in issuing the injunction; and 4) the circuit court failed to follow the technical requirements of West Virginia Rule of Civil Procedure 65 such as requiring the jockeys to post a bond.

**28.** In light of the relief sought by CTR & S to "confirm expiration" of the temporary injunction, it is clear that CTR & S had acted under the April 16, 2009, Order for more than a year, despite its argument before the Court that "the April 16, 2009 TROs expired by their own terms

and were never properly extended." If, indeed, CTR & S really believed that the April 16, 2009, Orders had expired it would have gone forward with ejecting the jockeys. It did not. Moreover, in the June 3, 2010, Order, the circuit court simply extended the injunction and stay it had already put in place on April 16, 2009, until the jockeys' appeal of the Racing Commission's decision to the circuit court was complete. This is confirmed by the language in the June 3, 2010, Order wherein the circuit court specifically states that it "incorporates by reference the findings and rulings of its April 16, 2009, Order which previously granted injunctive relief to the Petitioners and against the Track on the same grounds as those presented here." Thus, in denying CTR & S's motion, the circuit court necessarily was extending its April 16, 2009, Order by rejecting any confirmation that the April 16, 2009, had expired.

acknowledges that it failed to challenge the earlier April 16, 2009, Order. Specifically, CTR & S states in its motion:

[A]t the time the TRO was entered in this case, this precise issue was being litigated in a separate action pending before the Circuit Court of Kanawha County styled *PNGI Charles Town Gaming, LLC v. West Virginia Racing Commission, et al.,* Civil Action No. 09–MISC–106 (King, J.), and CTR & S decided not to challenge the Court's TRO in this case until the other case was decided. Moreover, CTR & S chose not [sic] take any independent action until the Racing Commission held its hearing before an administrative law judge.

CTR & S further acknowledges that even though it received a favorable ruling from Judge King in September 24, 2009, it "did not take any action to exclude the jockeys from its property." [29]

 CTR & S decided not to challenge the lower court's ruling imposing the injunction and stay, notwithstanding the law providing that interlocutory orders issuing preliminary injunctions are subject to immediate appellate review. *Telecheck Servs., Inc.,* 213 W.Va. at 445–47, 582 S.E.2d at 892–94. CTR & S's decision not to challenge the Order enjoining CTR & S and staying the imposition of sanctions against the jockeys at the time the Order was originally entered

was at CTR & S's own peril. Not only was this decision inapposite to the law providing for an immediate appeal, but also this Court consistently has held that "[a] litigant may not silently acquiesce to an alleged error . . . and then raise that error as a reason for reversal on appeal." Syl. Pt. 1, in part, *Maples v. W. Va. Dep't of Commerce, Div. of Parks and Recreation,* 197 W.Va. 318, 475 S.E.2d 410 (1996); *see State v. Lively,* 226 W.Va. 81, 92, 697 S.E.2d 117, 128 (2010) ("The Court consistently has held that 'silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial.' *State v. Grimmer,* 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), *overruled on other grounds, State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980). The raise or waive rule is designed 'to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error.' *Wimer v. Hinkle,* 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989).""). CTR & S waived its assigned errors regarding the injunction and stay.[30]

### IV. Conclusion

Based upon the foregoing, the decision of the Circuit Court of Kanawha County, West Virginia, is affirmed.

Affirmed.

---

29. CTR & S maintains that this Court implicitly upheld its common law right to exclude the jockeys and rejected "[t]he Racing Commission's reliance on 'plenary power'" and what CTR & S refers to as "a nonspecific rule of racing" to abrogate its common law right to exclude the jockeys when the Court refused the appeal of the circuit court's ruling in *PNGI Charles Town Gaming, LLC v. West Virginia Racing Commission, et al.,* No 100098 & 100099, on March 3 2010, under the old appellate rules.

As the Court consistently held under the former appellate rules:

This Court's rejection of a petition for appeal is not a decision on the merits precluding all future consideration of the issues raised therein, unless, as stated in Rule 7 of the West Virginia Rules of Appellate Procedure, such petition is rejected because the lower court's judgment or order is plainly right, in which case no other petition for appeal shall be permitted.

Syllabus, *Smith v. Hedrick,* 181 W.Va. 394, 382 S.E.2d 588 (1989); *see Stone,* 216 W.Va. at 382 n. 3, 607 S.E.2d at 488 n. 3. Consequently, contrary to CTR & S's argument, there was no implicit ruling by this Court regarding its alleged right to exclude the jockeys.

30. CTR & S seeks to have the Court apply the plain error doctrine.

An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Syl. Pt. 7, *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). The errors regarding the injunction and stay issued by the circuit court do not rise to the level necessitating the application of the plain error doctrine.

Justices BENJAMIN and KETCHUM dissent and reserve the right to file dissenting opinions.

BENJAMIN, Justice, with whom Justice KETCHUM joins, dissenting:

In its decision, the majority reasons that the Racing Commission's power to issue licenses to jockeys deprives PNGI Charles Town Gaming, LLC, d/b/a Charles Town Races & Slots (hereinafter "CTR & S") of its right to run its business in the manner it believes is necessary to protect its business interests and exercise its property rights. Specifically, the majority's holding establishes that the Racing Commission may, by its granting of licenses to jockeys, determine not only the minimum protections for horse racing and gaming customers at CTR & S, but also effectively the maximum protections. In doing so, the majority relies on an incomplete and selective reading of applicable statutory and administrative authority. Further, the majority applies this selective authority in a manner which not only exceeds the constitutional authority of the Racing Commission, but also deprives CTR & S of its business and property rights.

At the outset, I agree with the majority that the Racing Commission may properly, pursuant to the police powers of the state, issue licenses to jockeys to race at tracks within West Virginia and that through this licensing process the Racing Commission may afford to race track customers certain minimum protections for horse racing and gaming. I also do not dispute that the jockeys have a property right in the permits they receive from the Racing Commission *vis-a-vis* the state. However, the police powers of the state are not absolute, being limited strictly by the language of the constitution and by the jurisprudence of this Court. Further, the provision by the State to certain private persons of certain property or due process rights with respect to the State by means of a state license does not destroy or in any way minimize the full legal and natural rights already enjoyed by another private person, in this case a business and property owner. A constitutional "end run" is impermissible in our system of governance. The State cannot through its statutory licensing process attempt to create statutory rights for one individual which necessarily destroy the natural rights already enjoyed by another individual.

There is absolutely no law, constitutional or otherwise, which gives to jockeys in West Virginia the *right* to race at any track of their choosing regardless of the rights of the property owner. None. The licenses of the Racing Commission provide jockeys with the *privilege* of racing and are a means of ensuring minimum protections to the public for horse racing and gaming. They do not provide jockeys with the *right* to race wherever and whenever they desire. By finding otherwise, the majority has erroneously elevated a state agency-issued *privilege* to a *right* superior in nature and effect to the established property and business rights of CTR & S.

While the Racing Commission certainly can establish minimum racing safeguards at racetracks through its licensing pursuant to the police powers of the state, there is absolutely no legal basis for the majority to limit the property owner, here CTR & S, from imposing more stringent racing safeguards for the protection and assurance of its customers. In prohibiting CTR & S from exercising its prerogative to engage in stricter diligence of fairness in horse racing and gaming at its race track, the majority has improperly denied to CTR & S the full measure of its business and property rights and interfered with CTR & S's ability to determine how best to serve and protect its customers *beyond the minimum requirements established by state authority.*

### 1. West Virginia Statutory Law Limits the Authority of the Racing Commission

The majority quotes the introduction to § 19-23-6 which reads, "The Racing Commission has full jurisdiction over and shall supervise all horse race meetings, all dog race meetings and all persons involved in the holding or conducting of horse or dog race meetings and, in this regard, it has plenary power and authority.…" Eighteen sections then proceed after this language listing the ways by which the Racing Commission may

regulate racing, such as promulgating reasonable rules, investigating violations of those rules and the statute. However, § 19–23–6 concludes by stating that "[t]he Racing Commission shall not interfere in the internal business or internal affairs of any licensee." Seeking to serve and protect its customers to an extent beyond the minimum level of protection afforded by the Racing Commission is a matter solidly within the "internal business or internal affairs" of CTR & S. The majority's selective statutory consideration under the facts of this case highlight the legal error of the majority's overly expansive holding.

## 2. West Virginia Administrative Law Fails to Support the Majority Holding

The majority also argues that the West Virginia Code of State Rules and Regulations supports its position. It refers to W. Va. C.S.R. § 178–1–6.1 which reads:

> Any person ejected by the stewards or the association from the grounds of any association shall be denied admission to the grounds until permission for his or her reentry has been obtained from the association and the Racing Commission. However, all occupation permit holders who are ejected have the right of appeal to the Racing Commission.[1]

The majority also states in a footnote that the meaning of appeal in § 178–1–6.1, while defined in § 178–1–2.7 as "a request for the Racing Commission or its designee to hold a hearing and review any decisions or rulings

of the *stewards*" (emphasis added), "has been expanded to include an appeal of ejection by the stewards or by an association as well." It supports this conclusion by referring to § 178–1–2 which allows the meaning of a defined word to take on more than its definition in the W. Va.C.S.R. where "the context clearly requires a different meaning." In concluding that the context of § 178–1–6.1 requires "appeal" to take on a meaning above and beyond that delineated in § 178–1–2.7, the majority errs. "[A]ppeal," as used in § 178–1–6.1, plainly means only an appeal from a decision of the stewards.

In its opinion, the majority also places emphasis on the last sentence of § 178–1–6.1, but it completely glosses over the language in the preceding sentence. The first sentence of that section requires that for a person ejected by the stewards or the association to regain admittance, that person must obtain permission for reentry from the Racing Commission *and* the association. To read the two sentences of § 178–1–6.1 in the way that the majority does makes the section discordant, especially in light of the limits of the State's police power. Here, the clear language of the drafters of this portion of the West Virginia C.S.R. should be given effect and should be read as written: appeals may only be taken by persons ejected by the stewards, and when a person is ejected by an association, permission must be received from the association before that person may regain admission. The majority erred in not

---

1. It seems appropriate to note at this juncture that § 178–1–6.1 may be a false favorite; there are two additional sections to § 178–1–6, not just the section on ejection, regarding exclusion and suspension. It is curious that the majority did not mention these other two sections in its opinion. They read:
 6.2. The stewards or the association have the power to suspend or exclude from the stands and grounds persons acting improperly or whose behavior is objectionable. The stewards shall enforce the suspension or exclusion.
 6.3. When a person is excluded from a racetrack or is suspended, he or she is not qualified, whether acting as agent or otherwise, to subscribe for, to enter or run any horse in any race either in his or her own name or in that of any other person until the stewards rescind their penalty.
 Perhaps the majority decided to rely on § 178–1–6.1 because CTR & S's communication with the

jockeys used the word "ejection." However, what CTR & S calls its action is irrelevant; what matters most is whether its actions amounted to an ejection, exclusion, or suspension. Nowhere in the applicable sections of the W. Va.C.S.R. or the W. Va.Code are the terms "ejection," "exclusion," or "suspension" defined, and the majority takes no steps in explaining why "ejection" applies in this case.
 It is unquestionable that under §§ 178–1–6.2 and 6.3, there is no right to appeal to the Racing Commission. Under these sections, a person who is excluded or suspended may only regain access to the association's property with the permission of the association. If § 178–1–6.1 does in fact apply as the majority asserts, because it is the only section that is construed by the majority to provide support for its conclusion, I find it unnecessary to explore §§ 178–1–6.2 and 6.3 in any more depth.

giving plain effect to the clear language of the rule.

### 3. As applied, the Majority Decision Authorizes the Racing Commission to Exceed its Authority.

The Racing Commission derives its authority to regulate from the police powers of the state:

There cannot, in our opinion, be any doubt as to the power of the Legislature to regulate horse racing, nor does there seem to be any contention on that point. Whatever may be said in favor of horse racing, and much can be said, it must be admitted that great evil attends its practice, such as calls for the intervention of the State, under its police power, to the end that such evil be minimized so far as it is possible to do so.

*State ex rel. Morris v. West Virginia Racing Commission*, 133 W.Va. 179, 192–93, 55 S.E.2d 263, 270 (1949). This authority is therefore limited to that actually conveyed by the police power of the constitution and to the actual and natural rights of those affected by actions of the Racing Commission. This Court has also established that the premise of the police powers of the state is to protect and promote the general welfare of the public:

The police power is the power of the state, inherent in every sovereignty, to enact laws, within constitutional limits, to promote the welfare of its citizens. The police power is difficult to define precisely, because it is extensive, elastic and constantly evolving to meet new and increasing demands for its exercise for the benefit of society and to promote the general welfare. It embraces the power of the state to preserve and to promote the general welfare and it is concerned with whatever affects the peace, security, safety, morals, health and general welfare of the community.

Syl. pt. 5, *Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965). The Court has described the general welfare, in the context of the police power as:

embrac[ing a] whole system of internal regulation by which the state may subject persons and property to all kinds of reasonable restraints and burdens in order to secure the general comfort, health and prosperity of the state, to preserve public order, prevent offenses, and to establish for this intercourse of citizens with citizens those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights and to insure to each the uninterrupted enjoyment of his own rights so far as is reasonably consistent with a like enjoyment of rights by others.

*Farley v. Graney*, 146 W.Va. 22, 35, 119 S.E.2d 833, 841 (1960) (quoting 4 M.J., Constitutional Law, Section 66, pages 158–59).

The majority holds that the Racing Commission has the authority to require CTR & S to allow jockeys onto its private property so that the jockeys may participate in horse races. From where the majority gleans this authority is unclear. As this Court has recognized, the state's police power is "broad and sweeping"; however, the police power is confined by the requirement that it be used to create laws that preserve and promote the general welfare. The police power is not unlimited.

Creating laws and rules that regulate horse racing and the "great evil [which] attends its practice," protects the public from, *inter alia*, the dangers inherent in gambling and protects gamblers from potential fraud. See *West Virginia Racing Commission, supra*. I fail to see how the general welfare of the people of West Virginia is promoted by forcing CTR & S to admit onto its premises jockeys whose presence it deems harmful to its business. In no way does this action secure the general comfort, health and prosperity of the state, preserve public order, prevent offenses, or prevent a conflict of right. Instead, the action tramples on the property rights of a private business concerned that its customers be worried that "cheating" might be possible at the track. In reaching its decision, the majority has allowed the Racing Commission to exceed its constitutional authority, in direct disregard for the business and property rights of CTR & S.

The majority reasons that because CTR & S can only do business because of a license it

has received from the Racing Commission, it must submit to the Racing Commission's requirement that jockeys be admitted to race on CTR & S's property. It was also argued to this Court that because the Legislature has the power to abolish all gambling within the State, it must also have the power to require readmittance of the jockeys. It is of no matter that the Legislature has the power to declare wagering illegal, nor does it matter that CTR & S must be licensed by the Racing Commission. The underlying basis for the power of the Racing Commission to act, the police powers of the state, does not give the Racing Commission the constitutional authority, through either the licenses or permits it issues, to reach so far into the manner by which CTR & S conducts its business or to contravene the business and property rights of CTR & S, a private business.

I respectfully dissent to the majority opinion. I am authorized by Justice Ketchum to state that he joins in this dissent.