IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

_____

No. 14-0957

_____

FILED

**November 18, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA RACING COMMISSION,
Respondent Below, Petitioner

v.

LAWRENCE REYNOLDS, ANTHONY MAWING,
ALEXIS RIOS-CONDE, JESUS SANCHEZ, DALE WHITTAKER,
LUIS PEREZ, AND TONY A. MARAGH,
Petitioners Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Paul Zakaib, Jr., Judge
Civil Action No. 09-C-688

REVERSED

_____

Submitted: November 3, 2015
Filed:  November 18, 2015

Patrick Morrisey, Esq.
Attorney General
Kelli D. Talbott, Esq.
Senior Deputy Attorney General
Charleston, West Virginia
Attorneys for Petitioner

Benjamin L. Bailey, Esq.
Christopher S. Morris, Esq.
Bailey & Glasser LLP
Charleston, West Virginia
Attorneys for Respondents

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

2.      "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. pt. 2, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

3.      "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982).

4.      "Evidentiary findings made at an administrative hearing should not be reversed unless they are clearly wrong." Syl. pt. 1, *Francis O. Day Co. v. Dir.*, *D.E.P.*, 191 W. Va. 134, 443 S.E.2d 602 (1994).

5.      "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996).

6.      "'Substantial evidence' requires more than a mere scintilla. It is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. If an administrative agency's factual finding is supported by substantial evidence, it is conclusive." Syl. pt. 4, *In re Queen*, 196 W. Va. 42, 473 S.E.2d 483 (1996).

Benjamin, Justice:

Petitioner West Virginia Racing Commission ("the Commission") appeals the September 2, 2014, order of the Circuit Court of Kanawha County that reversed the Commission's order that suspended the occupational permit of each of seven respondent jockeys for thirty days and imposed a fine of $1,000 each for violating a rule governing horse racing. After review of the circuit court's order, the assignments of error, the applicable law, and pertinent portions of the appendix, for the reasons stated below, we reverse the circuit court's order.[1]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Commission is charged with overall regulation of horse racing in West Virginia.[2] The respondents are seven jockeys who hold permits issued by the Commission which allow them to ride thoroughbred horses at State racetracks. Prior to each race, the jockeys must weigh out by stepping onto a digital scale operated by a clerk of scales who is an employee of the racetrack. A jockey's weight is used to determine which horse he will ride in the upcoming race. Generally, younger horses are assigned lighter jockeys, and more mature or better-performing horses are assigned heavier jockeys. The purpose of having horses carry different weights is to make the races more

---

[1] This is the third time that this dispute has been before this Court. *See PNGI Charles Town Gaming, LLC v. Reynolds*, 229 W. Va. 123, 727 S.E.2d 2d 799 (2011) (same case) and *PNGI Charles Town Gaming, LLC v. Racing Comm'n*, 234 W. Va. 352, 765 S.E.2d 241 (2014) (related matter).

[2] *See* W. Va. Code §§ 19-23-1 *et seq*.

1

competitive. The betting public is informed if a jockey is overweight prior to a race, and this information is used in making wagering decisions.

In March of 2009, management of the racetrack at Charles Town Races & Slots heard rumors that certain jockeys were permitted to ride in excess of their stated weights. As a result, track management installed two hidden surveillance cameras in the area where the weigh outs occur. The day after video recordings were made of weigh-outs, the clerk of scales was relieved of his duties and removed from the track. Thereafter, the respondents were summoned to hearings on allegations that they had engaged in corrupt activities and ridden at weights in excess of their reported weights.

In April 2009, the board of stewards concluded that the respondents had violated certain provisions of the West Virginia Code of State Rules including failure to declare an overweight amount.[3] The board of stewards imposed a $1,000 fine on each of the jockeys and a thirty-day suspension of each of the jockey's occupational permits. The respondents appealed the decision of the board of stewards to the Commission.[4] The administrative de novo hearing before the Commission hearing examiner occurred over five days in August and September 2009. In his recommended decision, the hearing examiner found that the respondents were guilty of conniving with the clerk of scales in

---

[3] The stewards are racing officials at the racetrack that "are strictly responsible to the Racing Commission for the conduct of all meetings in every detail . . . pertaining to the racing law and rules of the Racing Commission." W. Va.C.S.R. § 178-1-10.2.

[4] *See* W. Va. Code § 19-23-16 (2011) (pertaining to judicial review of suspension or revocation of occupational permits).

2

the commission of a corrupt practice by engaging in improper weigh outs. This decision was adopted by the Commission which suspended each respondent's occupational permit for thirty days and imposed the fine of $1,000 each.

The respondents appealed the Commission's decision to the Circuit Court of Kanawha County which reversed and vacated the Commission's order in its September 2, 2014, final order. The circuit court found that the Commission engaged in improper rule-making by defining two terms in an administrative rule, and that the retroactive application of the new rule to the respondents' conduct was unlawful. The Commission now appeals the circuit court's ruling to this Court.

## II. STANDARD OF REVIEW

This Court has held that

> [o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996). Moreover, "[i]n cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. pt. 2, *id.* With these standards in mind, we proceed to analyze the issues.

3

# III.   ANALYSIS

## A.   *Circuit Court's Finding of Impermissible Rule-making*

The Commission first assigns as error the circuit court's ruling that the Commission's defining of the terms "connive" and "corrupt" in W. Va. Code R. § 178-1-60.5 constituted improper rule-making. According to the Commission, it did nothing more than define undefined terms in a legislative rule which it is permitted to do.  We agree with the Commission.

> The Commission found in its final order in pertinent part:
>
> W. Va. Code R. § 178-1-60.5[5] states "[n]o person shall conspire with any other person for the Commission of a corrupt or fraudulent act or practice, or connive with any other person in any corrupt or fraudulent practice in relation to racing nor commit an act on his or her own part.
> . . . .
> The Commission hereby finds that "connivance", as that term is used in this Commission's rule, W. Va. Code R. 178-1-60.5, includes acquiescence by a licensee in the behavior of others. Further, the Commission finds that "corrupt" as that term is used in the aforementioned rules includes the diminution or adulteration of procedures necessary for thoroughbred racing and pari-mutual wagering to work in such a way as to ensure confidence in the integrity of the process by the wagering public.
> Hence . . . review of the evidence shows . . . an acquiescence by the appellants in the diminution and adulteration of the weigh-out process of a level sufficient as to injure confidence in the integrity of that process. It is axiomatic that confidence in the process is a, if not the, necessary component in assuring continued public participation in the pari-mutual wagering that allows thoroughbred racing to maintain its viability.

---

[5] This rule no longer is in effect.

4

Accordingly, the Commission, with the modifications noted herein, finds that the appellants did, in fact violate the provisions of W. Va. Code R. § 178-1-60.5 in that they "connived" with [the Clerk of Scales] in the commission of a "corrupt" practice. The Commission would again note that the appellants as licensees acquiesced in [the Clerk of Scales'] allowing the weigh-out procedure to be made meaningless if not misleading, and that constitutes a "corrupt" act or practice.

(Footnote added).

In its order reversing the Commission's ruling, the circuit court found that the Commission's defining of the words "connive" and "corrupt" constituted rule-making in violation of prescribed rule-making procedures. Moreover, the circuit court found that the retroactive application of the new rule to the respondents' conduct violated constitutional *ex post facto* provisions[6] as well as the respondents' constitutional procedural due process rights.[7]

Under our law, "[i]t is generally accepted that statutes and administrative regulations are governed by the same rules of construction." *Snider v. Fox*, 218 W. Va. 663, 667, 627 S.E.2d 353, 357 (2006) (internal quotations and citations omitted). One

---

[6] Article III, Section 4 of the Constitution of West Virginia states in pertinent part, "No bill of attainder, ex post facto law, or law impairing the obligation of a contract, shall be passed."

[7] Article III, Section 10 of the Constitution of West Virginia provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

such rule of construction provides that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982). Therefore, it is clear that an administrative body, in applying an administrative rule, may give an undefined term in the rule its common, ordinary and accepted meaning. The Commission in this case did nothing more than give the undefined terms "connive" and "corrupt" in W. Va. Code R. § 178-1-60.5 their common, ordinary, and accepted meanings.[8]

The respondents make much of how the Commission characterized its defining of "connive" and "corrupt." Specifically, the Commission stated in its order that it adopted different interpretations for the "terms of art" than were used by the board of

---

[8] For common definitions of the word "connive," *see* New Oxford American Dictionary 369 (3rd ed. 2010) (to "secretly allow (something considered immoral, illegal, wrong, or harmful) to occur"); Merriam-Webster's Collegiate Dictionary 264 (11th ed. 2005) ("to pretend ignorance of or fail to take action against something one ought to oppose"); The Oxford English Dictionary Vol III 748 (2nd ed. 1989) ("to shut one's eyes to an action that one ought to oppose, but which one covertly sympathizes with; to wink at; be secretly privy or accessory").

For common definitions of the word "corrupt," *see* New Oxford American Dictionary 390 (3rd ed. 2010) (to "change or debase by making errors"); Merriam-Webster's Collegiate Dictionary 281 (11th ed. 2005) ("to degrade with unsound principles or moral values"); The Oxford English Dictionary Vol. III 973 (2nd ed. 1989) ("to destroy . . . the correctness or original form of").

stewards or the hearing examiner. The Commission indicated that "[w]hereas much discussion has been had regarding the intent or *mens rea*[9] required to connive it is incumbent upon this Commission to clarify the level of intent or agreement necessary for a violation to occur." (Footnote added). Despite the Commission's inartful explanation of its defining of the two terms at issue, the terms "connive" and "corrupt" are not terms of art unique to the horseracing industry but are common terms used in a variety of contexts. As such, under our law, the Commission gave these terms their common, ordinary, and accepted meanings. In addition, it was well within the discretion of the Commission to reject definitions of the terms applied by the board of stewards or the hearing examiner and to adopt its own definitions.

In ruling that the Commission engaged in improper rulemaking by defining the terms "connive" and "corrupt," the circuit court primarily relied on this Court's decision in *Coordinating Council v. Palmer*, 209 W. Va. 274, 546 S.E.2d 454 (2001). In *Palmer*, providers of certain homemaker services sued the State Tax Commissioner challenging the Commissioner's imposition on them of a health care services privilege tax. The Tax Commissioner did not impose the tax on providers of the homemaker services at issue for nearly five years after the enactment of the law providing for the tax.

---

[9] Black's Law Dictionary defines "mens rea," in part, as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime." 1134 (10th ed. 2014). . Because "*mens rea*" denotes the state of mind of the defendant that the State must prove in a criminal prosecution, it has no specific application in the instant case.

The Tax Commissioner then implemented a procedure to collect the tax that he previously had not enforced by sending a letter to the affected taxpayers. In considering whether this letter constituted impermissible rulemaking by the Tax Commissioner, this Court relied upon the definition of "rule" found in the Administrative Procedures Act as follows:

> "Rule" includes every regulation, standard or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, affecting private rights, privileges or interests, or the procedures available to the public, adopted by an agency to implement, extend, apply, interpret or make specific the law enforced or administered by it, or to govern its organization or procedure, but does not include regulations relating solely to the internal management of the agency, nor regulations of which notice is customarily given to the public by markers or signs, nor mere instructions. Every rule shall be classified as "legislative rule," "interpretive rule" or "procedural rule," all as defined in this section, and shall be effective only as provided in this chapter[.]

*Palmer*, 209 W. Va. at 284, 546 S.E.2d at 464 (citing W. Va. Code § 29A-1-2(i) (1982); other citations omitted). This Court determined that pursuant to the above definition, the Tax Commissioner's letter to affected taxpayers constituted a "rule." We explained our determination as follows:

> In the case *sub judice*, the [Tax] Commissioner implemented a procedure to collect a tax that he previously had not enforced. As this policy statement, albeit in the form of a letter to the affected taxpayers, nevertheless "affect[ed] private rights, privileges or interests" and involved the Tax Department's "implement[ation], exten[sion], appl[ication], [or] interpret[ation]" of the laws which it was charged to execute, we find that the Commissioner's letter . . . did, in fact, constitute an agency rule that was required to comply with the detailed rule-making procedure set forth in W. Va.

8

Code § 29A-3-1, *et seq.* Because the Commissioner's stated policy did not follow the requisite mandates for formal proposal, approval, adoption, etc., *see id.*, his attempted enforcement of the health care services providers tax was void and ineffective.

*Id.*

We find the circuit court's reliance on *Palmer* to be misplaced. Unlike in *Palmer*, there is no evidence that the Racing Commission previously applied W. Va. Code R. § 178-1-60.5 differently than it did against the respondents in the instant case. The Commission, by defining "connive" and "corrupt" did not state a new policy, implement a new rule, extend the existing rule, or apply or interpret the rule in a novel manner. The Commission simply defined two words in the rule that are not defined. Therefore, we find that the circuit court erred in ruling that the Commission's defining of the terms "connive" and "corrupt" in W. Va. Code R. § 178-1-60.5 constituted rulemaking. Having found that the Commission did not make a new rule, we further find that the Commission did not retroactively and unlawfully apply a new rule to the respondents' conduct. Specifically, this Court concludes that because the Commission did not engage in improper rulemaking, the Commission's application of W. Va. Code R. § 178-1-60.5 to the respondents did not violate their constitutional due process rights or amount to an *ex post facto* law.

**B.    *Sufficiency of Evidence to Support the Commission's Decision***

9

The Commission also assigns as error the circuit court's determination that the evidence adduced below does not support the Commission's finding that the respondents connived with the clerk of scales in corrupt practices.

At the outset of our consideration of this issue, we are mindful that "[e]videntiary findings made at an administrative hearing should not be reversed unless they are clearly wrong." Syl. pt. 1, *Francis O. Day Co. v. Dir., D.E.P.*, 191 W. Va. 134, 443 S.E.2d 602 (1994). We have explained that "[t]he 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). Further, this Court has held that "'[s]ubstantial evidence' requires more than a mere scintilla. It is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. If an administrative agency's factual finding is supported by substantial evidence, it is conclusive." Syl. pt. 4, *In re Queen*, 196 W. Va. 42, 473 S.E.2d 483 (1996). We will utilize these standards in determining whether the Commission's factual findings are supported by substantial evidence.

The Commission in its order found that the respondents connived with the clerk of scales by acquiescing in his "allowing the weigh-out procedure to be made meaningless if not misleading in a way that constitutes a 'corrupt' act or practice" in that it diminished or adulterated the "procedures necessary for thoroughbred racing and pari-

10

mutual wagering to work in such a way as to ensure confidence in the integrity of the process by the wagering public."

In its order reversing the Commission's decision, the circuit court concluded that that there was insufficient evidence to support the Commission's factual findings. The circuit court's conclusion is based on several findings set forth in its order. First, the circuit court found the record devoid of any evidence which would tend to show that the weigh-out procedures described in the record actually caused a loss of confidence by the betting public in the horseracing process. The circuit court specifically noted an absence of testimony by a bettor that he or she was aware of the improper weigh-out procedures which caused a loss of confidence. We find the circuit court's reasoning on this matter to be error. Given the fact that jockey overweight information is provided to the betting public and used by bettors in placing bets, the Commission, as the finder of fact, could legitimately infer that an ineffective or misleading weigh-out procedure that casts doubt on the accuracy of the jockeys' weights would cause the betting public to lose confidence in the integrity of the horseracing process.

The circuit court also found that the chief steward testified before the hearing examiner that his observations of the weigh-out process leading up to and including March 26 and 27, 2009, failed to disclose evidence that the weigh-out process was flawed. This Court's review of the chief steward's testimony indicates that he testified that from January through March 2009, he was in the weight-out room "pretty

11

near" every night but not every night. He testified that while he was in a position to observe the weigh outs, his purpose was not necessarily watching the clerk of scales do his job. Instead, his job was to do a "walk through" to see if there were any issues that the jockeys wanted to discuss with the board of stewards. We infer from this testimony that the chief steward did not carefully observe every weigh out for the purpose of guaranteeing its authenticity and, as a result, cannot refute the Commission's findings regarding the respondents' improper weigh-outs.

In addition, the circuit court found that the scale in use by the respondents and other jockeys was not balanced, had not been accurately calibrated, was not being used properly and, as a result, could not be trusted to provide an accurate weight. This Court's review of the evidence indicates, however, that the evidence on the accuracy of the scale was conflicting. The Commission's expert testified below that the scale was operated in a manner that would provide an accurate weight. He also testified that it made no difference if the scale was not level because the scale was calibrated in the out-of-level condition. We have previously indicated that "this Court may not displace the . . . [Commission's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before . . . [us] *de novo.*" *In re Queen*, 196 W. Va. at 446, 473 S.E.2d at 487 (internal quotation marks and citations omitted). Therefore, the presence of conflicting evidence before the hearing examiner does not support the circuit court's reversal of the Commission's factual findings.

12

Further, the circuit court found that the Commission's determination to discipline the respondents was arbitrary and capricious because all of the other jockeys who weighed out during the same time period engaged in the same conduct as the respondents. To support this finding, the circuit court refers to several jockeys who were not disciplined but who are seen on the video weighing out improperly. Again, this Court finds that this is not a valid reason to reverse the Commission's findings.

Moreover, the circuit court found no evidence that the respondents were overweight or rode at an inappropriate weight. However, the Commission did not find that the respondents violated W. Va. Code R. 178-1-60.5 by riding at an inappropriate weight but rather by acquiescing to the clerk of scales' conducting of improper weigh outs in a manner that would cause the betting public to lose confidence in the process. As a result, this finding by the circuit court is not relevant to the Commission's ruling.

Significantly, "[n]either this Court nor the circuit court may supplant a factual finding of the Commission merely by identifying an alternative conclusion that could be supported by substantial evidence." *In re Queen*, 196 W. Va. at 446, 473 S.E.2d at 487 (citations omitted). The circuit court's findings well may be supported by substantial evidence, but this does not mean that the Commission's findings are not also supported by substantial evidence. Thus, the fact that the circuit court's review of the evidence resulted in the circuit court reaching an alternative conclusion based on substantial evidence is not a valid reason to reverse the Commission's findings.

13

Finally, this Court's review of the Commission's findings in light of the evidence of record compels us to conclude that the Commission's findings of fact are supported by substantial evidence. If this Court had conducted a *de novo* review of the evidence below, we may have reached the same conclusions as the circuit court. However, granting proper deference to the Commission's findings and reviewing the findings for clear error, we believe that there is more than a scintilla of evidence supporting the Commission's findings, and that the relevant evidence is such that a reasonable mind may accept it as adequate to support the Commission's conclusions. Stated differently, we are unable to conclude that the Commission's findings are without a rational basis. Therefore, we find that the circuit court abused its discretion in reversing the Commission's order.

## IV.    CONCLUSION

For the reasons set forth above, we reverse the September 2, 2014, order of the Circuit Court of Kanawha County that reversed and vacated the order of the Racing Commission that suspended the occupational permit of each of the respondent jockeys for thirty days and imposed a $1,000 fine on each of the respondents.

Reversed.